**CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, et al., Plaintiffs,**

v.

**Bill STROM, et al., Defendants.**

No. 83 C 9662.

United States District Court,
N.D. Illinois, E.D.

April 21, 1986.

Helen A. Scheller, Hugh J. McCarthy & Associates, Ltd., Chicago, Ill., for plaintiffs.

David Apter, Jill A. Dougherty, Kantor & Apter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Chicago District Council of Carpenters ("Union") and several co-plaintiffs [1] sue various Strom entities (collectively "Strom") [2] and Sundance Homes, Inc.

---

1. Co-plaintiffs are (1) Union's Pension Fund, Welfare Fund and Apprentice and Trainee Program (collectively "Funds") and (2) Trustees of the three Funds.

2. Strom defendants comprise (1) Bill Strom Contractors, (2) Strom Construction Co., (3) Bill (a/k/a Willard) Strom and (4) Harry Strom. According to the Complaint the various Strom entities acted interchangeably, and the current motion does nothing to challenge that assertion. It will be accepted for purposes of this opinion.

("Sundance") under Labor Management Relations Act ("LMRA") § 301 ("Section 301"), 29 U.S.C. § 185, and Employee Retirement Income Security Act ("ERISA") §§ 502 and 515, 29 U.S.C. §§ 1132 and 1145, claiming:

 1. Strom breached its collective bargaining agreement ("CBA") with Union by failing to pay wages and Fund obligations to and on behalf of Union's members (Count I).

 2. Sundance breached its unwritten contract to pay wages and Fund obligations to and on behalf of Union's members according to the rates established by the CBA (Count II).

 3. Sundance breached its agreement with Union to pay Strom's obligations under the CBA in the event of Strom's default (Count III).

Sundance has filed an alternative dismissal-summary judgment motion.[3] Treated as the latter,[4] the motion is granted in part and denied in part.

### Facts[5]

During 1983 Sundance was general contractor for a construction project in Lake Zurich, Illinois (the "Lake Zurich Project"). Strom was Sundance's carpentry subcontractor (Sanderman Aff. ¶ 7). At least since 1980 Strom has been signatory to Union's form CBA, which in relevant part provided Strom would (Complaint Exs. A–C):

 1. recognize Union as sole bargaining agent for its employees;

 2. agree to be bound by the terms of the trust agreements establishing Funds;[6]

 3. agree to be bound by the terms of the agreement negotiated between Union and Mid-America Regional Bargaining Association ("MARBA"), an employers' group bargaining agent;

 4. furnish Union with a certificate of insurance covering liability under the Illinois Workers' Compensation and Occupational Disease Acts;

 5. furnish Union with a surety bond covering Strom's CBA wage and Fund obligations; and

 6. dedicate itself to improvement of the construction industry by providing dispute-resolution machinery to avoid strikes and work stoppages.

Sundance was not a CBA signatory (Sanderman Aff. ¶¶ 2–3).

Toward the end of 1983 Strom encountered financial difficulty. Apparently it had underbid the Lake Zurich Project job (Sanderman Dep. 47). It failed to meet its payroll and Fund obligations, and Union called a strike (Ugolini Dep. 25).

Picketing lasted for about an hour, until a Sundance representative came out and spoke to Union business agent Louis Ugolini ("Ugolini") (Dep. 30–31):

> He told me that he wished that I had contacted him prior to the picketing; that

---

**3.** Though the motion does not explicitly so state, it is presumably made under Fed.R.Civ.P. ("Rules") 12(b)(6) and 56.

**4.** Rule 12(b) concludes:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Both sides have indeed presented extensive "matters outside the pleading." Though neither has submitted the statements of undisputed and disputed facts required in connection with sum-

mary judgment motions by this District Court's General Rules 12(e) and (f), this Court elects to proceed under Rule 56.

**5.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovants—here plaintiffs. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles.

**6.** Sundance does not claim any Fund is not an "employee benefit plan" in ERISA terms, 29 U.S.C. § 1002(3).

in the future, he would appreciate it if I would get to him first because he didn't want the picketing to go on. So he said, "Please contact me next time, and I'll make sure that the fringes are taken care of."

After that conversation Ugolini withdrew the pickets (*id.* 31).

Strom's financial troubles continued, as did Sundance's desire to keep the Lake Zurich Project moving despite them. Sundance monitored Strom's activities "more closely than [it] would normally monitor the activities of a carpentry subcontractor" (Sanderman Dep. 49) and began to pay Strom on a weekly basis "for work in place" (*id.*).

Sundance also made various representations to Union to induce its members to keep working despite Strom's shaky financial condition. Because those representations form the centerpiece of the parties' dispute, they will be set out in some detail.[7]

Late in September Sundance Vice President Richard Pietranek ("Pietranek") met with Strom carpenters in a garage at the Lake Zurich Project site. According to carpenter Jerry Fencl Dep. 12:

A. We were all assembled, and Mr. Pietranek said the meeting was being called because of the difficulties with the paychecks, and he wanted us to feel confident that we would be paid our due wages, that he didn't want any problems on the job site with the union and—

\* \* \* \* \* \*

A. I am referring to wages. When I refer to wages, I am also referring to fringe benefits, health and welfare, hospitalization, the whole union package.

Q. Did Pietranek specifically refer to benefits?

A. Yes.

Another carpenter recalls (Thomson Dep. 40):

A. He came out and he wanted to assure us that if something happens to Strom, that we'd guarantee your wages and benefits; and don't listen to any rumors, they're not true, you know, we'll stand behind you; if we're behind Strom, everything's okay, you know. And I guess he was getting payouts every week then to meet our payroll.

Q. Strom was getting payouts every week?

A. Well, that's what was mentioned, that he was going to get a payout every week so that he could meet our payroll then.

Q. The Sundance Vice President said that Sundance would pay Strom weekly so that Strom could pay the men weekly?

A. Right. But he was just out there to just assure us that we were going to be paid and everything and don't worry about it, just do your job and—

And a third carpenter says (McCarthy Dep. 49):

A. [Pietranek] was coming out saying that I will guarantee your wages and your benefits. And instead of giving Bill Strom—He also said that Bill Strom was the only contractor getting payouts once a week instead of twice a month. He was paying him weekly so our checks would be good. But he guaranteed us our wages and benefits. That's the only reason we hung around.

Q. Did he say how it was that he was going to guarantee it? Did he say where it was the money was coming from?

A. I don't remember.

Q. Did he say that Sundance would pay directly or Sundance would see to it that Strom paid?

A. All I can remember him saying is, I guarantee your wages and your benefits, Sundance. So whatever he meant by that—

Q. He did say that Strom was getting weekly payouts?

A. Yes.

Q. So that Strom could pay wages?

---

7. Few of the parties' submissions refer to specific dates. All conversations took place between September and December 1983, but greater precision as to times and sequences is impossible to achieve—and unnecessary to resolution of Sundance's motion.

A. Yes.

One other carpenter says (Lohrmann Dep. 60):

A. [Pietranek said] they would make sure that they would meet payroll. They didn't say that they would give us checks, but they would meet payroll. I don't know what they did with Bill [Strom], you know, but we got his checks the whole time, Strom checks.

During October Sundance President Maurice Sanderman ("Sanderman") was in "semi-continual" communication with Union regarding the possibility of a direct Sundance-Union contract (Sanderman Dep. 53). Though nothing came of that, Sanderman Dep. 37 says:

We agreed to attempt to act as an intermediary between the union and Strom and to make some payments from the monies that Strom was to receive from us after earning it to the union. I believe we made an initial payment that kind of got him relatively current on his past debt to the union. In lieu of paying Strom, I believe we paid the union for work performed. That may have been a joint check, it may have been a check directly to the union; but it was for work that he had completed.

And we made representations to the union that as he earned money, we would try to calculate the hours at whatever the benefit rate was and withhold that from payments and try to get that to the union if we owed Strom any money. It's kind of what went on.

After one such telephone conversation with Union executive Robert Newell ("Newell"), Sanderman told Ugolini (Ugolini Dep. 35):

A. [Sundance] would take care of the fringes.

Q. Did he say how he would do that?

A. No, he didn't.

Q. Did he say if he would use his own money to do it?

A. I don't remember that at all.

On November 9, Sanderman and Bill Strom met with Newell and Union executive Robert Lid at Union's offices. Sander-man again mentioned the possibility Sundance might become a Union carpentry contractor (Lid Dep. 18). He also said he had "assure[d]" Strom's carpenters (id.):

that he and Sundance Homes would see that nothing happened to hurt them.

At that meeting Newell Dep. 13–14 says:

A. And we had discussed how [Strom] was being paid, how his payouts were being made. Then we got a—somewhat of an assurance from Mr. Sanderman that the payments would be faster and that they would issue for work—he had X amount of work that he had completed, X amount of work that was in progress, and that there were a lot of extras that they were being billed for and that they would issue us joint checks, a check would be issued to the trust funds jointly by Sundance and Strom to bring up some of the arrearages. And I believe we had a check that Strom had given us that had bounced. Sanderman guaranteed us that he would make that check good.

Q. Was that check made good?

A. Yes, it was.

\* \* \* \* \* \*

A. Yes, it was a joint check, Strom and Chicago District Council of Carpenters.

MR. APTER: Q. And this replaced a Strom check in the same amount?

A. I don't believe it was in the exact same amount, no. The other—It can't be the same check.

But Newell was not certain whether or not Sanderman's representation concerning the fringe benefits was unconditional (id. 26):

Q. Did Sanderman ever tell you that he would do whatever he had to do regardless of whose money he did it with to see that the fringes were paid?

A. Well, I don't know if he said regardless of whoever's money. He said that the fringe benefits were going to be paid. He was promising us that all the way down the line.

Late in November Sanderman met with the Strom carpenters in a trailer on the

jobsite. Sanderman Dep. 52 says he told the carpenters Strom would be paid weekly "for any work in place" and he would "see to it that the men got paid from that payment." He does not recall using the word "guarantee." One carpenter present recalls (Terp Dep. 32):

A. He said that—the first thing I remember he said was, "Fellas, this is a good news meeting"; and he told us that he wanted us to understand that we were going to be paid and that our benefits were going to be paid.

Q. Did he say how?

A. He said he was—he was going to make sure that Strom had the money to pay the men.

Another carpenter recalls more specific promises (Thomson Dep. 41–42):

Q. Do you remember what he said?

A. Yes. That he'd guarantee our wages and benefits.

Q. Did he say how he would guarantee it?

A. Just that he would guarantee our wages and benefits; that if something would happen to Strom, that he would guarantee our wages and benefits. Because I think at that point it was getting pretty desperate around there. I mean, if there wasn't something done, that everybody would have been left and gone.

Yet a third carpenter says Sanderman, in addition to "guarantee[ing]" wages and benefits, told the men (Lohrmann Dep. 61):

even if he had to, he liked the work, that he would even think of hiring us to finish it off.

That however did not come to pass. On December 9 the Strom carpenters received a note instead of a check in their pay envelopes. In the note Sanderman said Strom had been terminated and Thiel Builders—another subcontractor—would complete the project (Terp Dep. 33). Newell (Dep. 26) is not certain whether Union or Sundance "pulled the pin" on Strom.

*Subject-Matter Jurisdiction—Section 301*

Plaintiffs' theory is straightforward:

1. Through its course of action and the oral representations of its officers, Sundance "adopted and became bound by the provisions of the collective bargaining agreement" (Pl. Mem. 6).

2. That contractual relationship between Union and Sundance then confers subject-matter jurisdiction under Section 301 (*id.* 7).[8]

So stated, that argument suffers from one enormous flaw: None of the evidence adduced by plaintiffs shows any agreement or intent by Sundance to "adopt" or "become bound by" the CBA. Certainly there was no direct agreement between Union and Sundance qua contractor. Though Sanderman admitted he had asked about becoming a Union contractor, neither side says that inquiry reached contractual fruition.

■ Thus plaintiffs' position is rather that Sundance signed on to the CBA between Union and Strom by guaranteeing that Strom's wage and fringe benefit obligations would be made good. Sundance of course does not go so far as to admit it "guaranteed" anything. All it concedes is it agreed to parcel out Strom's payments so Strom would be able to meet its CBA obligations. Plaintiffs' version differs: They say Sundance agreed to pay whatever unpaid benefits Strom's carpenters had earned, regardless of whether Sundance owed Strom more money.

If that were the relevant (or "outcome determinative") dispute, it would bar summary judgment. See *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984). But even on plaintiffs' terms (treating Sundance as having agreed to pay on Strom's default, whether or not Strom had money coming from Sundance),

**8.** Section 301 provides:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....

Sundance entered into a classic guaranty agreement and no more. It undertook no obligation independent of Strom's commitment to pay wages and fringe benefits. Sundance was simply a surety—a backstop—against nonpayment by CBA party Strom.

It requires only a brief look at the CBA's other obligations to show the fallacy in plaintiffs' contention. For example, nothing in any of the deposition testimony suggests Sundance intended to become bound by the CBA's dispute-resolution machinery or its insurance bonding requirements, nor were any of the MARBA-negotiated terms ever mentioned. Wages and fringe benefit payments are a major focus of collective bargaining agreements, but they are far from the only one. Like all CBAs, the one at issue in this case dealt with all aspects of the employment relationship and employer-employee-Union commitments. Neither Sundance nor plaintiffs have suggested anything more was at stake than a guaranty of financial obligations incurred by Strom.

True enough, the intent of parties to a contract is usually a factual question not resolvable on a summary judgment motion (see *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976) (per curiam)). But the nonmovant on a summary judgment motion must come forward with some evidence of the existence of a genuine and material factual issue (*Big O*, 741 F.2d at 163). Nothing offered by plaintiffs supports the inference of an intention on Sundance's part beyond the one to stand behind Strom's financial obligations under the CBA.

 Classifying the Sundance undertaking as a guaranty rather than actual entry into a CBA does not end the Section 301 inquiry, however. After all, Section 301 does not require a collective bargaining agreement: All it calls for is a "contract" between an "employer" and a "labor organization." *Retail Clerks International Association, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962) teaches:

> We need not decide whether or not this strike settlement agreement is a "collective bargaining agreement" to hold, as we do, that it is a "contract" for purposes of § 301(a). "Contract in labor law is a term the implications of which must be determined from the connection in which it appears." *J.I. Case Co. v. Labor Board*, 321 U.S. 332, 334 [64 S.Ct. 576, 579, 88 L.Ed. 762]. It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them.

Obviously a guaranty is a contract. Further, drawing the reasonable inference most favorable to plaintiffs, Sundance's guaranty was independent of its obligation to pay Strom. And for that guaranty Sundance received a direct benefit: undelayed progress toward completion of the Lake Zurich Project and the absence of labor strife on the jobsite.[9]

But not every agreement to which a labor organization is a party is within Section 301, for the contract must at least concern an "employment relationship" between the parties (*id.*). No one would argue Section 301 confers federal subject matter jurisdiction over contracts between a union and

---

9. Indeed, that is one reason why such an oral guaranty by Sundance would not run afoul of the Statute of Frauds, Ill.Rev.Stat. ch. 59, ¶ 1:

> No action shall be brought ... to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person ... unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith....

Where the guarantor's main purpose is "to promote some interest of his own," the promise does not fall within the statute (*Clifford v. Luhring*, 69 Ill. 401, 402 (1873)). That was surely so here, where the goal of Sundance's promise to Union was to obtain Union's agreement not to strike or slow down—a direct benefit to Sundance.

(say) a stationer involving the purchase of office supplies.

This opinion has already rejected plaintiffs' only argument supporting the existence of an "employment relationship"—their claim Sundance adopted the CBA, thereby *creating* such a relationship. Pl. Mem. 9 labels as "misguided" Sundance's attempts to refute other theories supporting the relationship, as plaintiffs do not rely on them. But because plaintiffs have failed to establish a triable fact question as to whether Sundance adopted the CBA, they must look elsewhere for the existence of an employment relationship between Union and Sundance.

Common-law categories of "employee," "subcontractor" and "independent contractor" do not control federal labor-relations cases (*NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 121–22, 125, 64 S.Ct. 851, 855–56, 88 L.Ed. 1170 (1944)). As *Hearst* teaches (*id.* at 128–29, 64 S.Ct. at 859–60) (footnotes omitted):

> [Congressional] Reports on the [Wagner Act] disclose clearly the understanding that "employers and employees not in proximate relationship may be drawn into common controversies by economic forces," and that the very disputes sought to be avoided might involve "employees [who] are at times brought into an economic relationship with employers who are not their employers." In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as "employee," "employer," and "labor dispute," leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications.

Accord, *NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 403, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947).

Recognizing it cannot carry the day by simply labeling Strom an independent contractor, Sundance argues the "underlying economic facts" show it is not an employer of Union's members because it is not (1) merely Strom's "alter ego" or (2) a joint employer with Strom. Yet those factually-based arguments—though grounded on mere assertions unsupported by affidavits or depositions—might be accepted arguendo and still fail. For they rest on an analysis of the Union-Strom-Sundance relationship as it was *before* Strom's troubles and Sundance's intervention. At that earlier stage it is plain no employment relationship existed between Sundance and Union (see *Westinghouse Electric Corp. v. Oil, Chemical & Atomic Workers International Union, AFL–CIO*, 163 N.L.R.B. 914, 915 (1967) (finding, on basis of contractor-subcontractor relationship, contractor was not subcontractor's alter ego)). Indeed plaintiffs do not contend otherwise.

But Sundance's relationships with Union and Strom changed significantly once Union threw up its picket line. Sundance then initiated direct contacts with Union to procure labor peace. Treating Strom as a mere pawn during its meetings with Union executives, Sundance negotiated directly with Union, promising to withhold money owed to Strom or to issue joint Strom-Union checks. Sundance was not acting as a commercial surety whose only concern was actuarial probability. It dealt with Union to make sure Union's members would perform their jobs at the Lake Zurich Project—jobs they were contractually entitled to walk away from when Strom went into default. Avoidance of construction delay, not protection of Strom, was Sundance's main concern.

That really distinguishes this case from *Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1366 (9th Cir.1981), on which Sundance relies. There the general contractor dealt only with the subcontractor and not with the union at all. Nor is this case like *Carpenters Southern California Administrative Corp. v. Majestic Housing*, 743 F.2d 1341, 1344–45 (9th Cir.1984), which held a union's action, seeking to foreclose a mechanic's lien on the general contractor for the subcontractor's collective bargaining agreement obligations, did not fall

within Section 301's jurisdictional ambit. Though the amount recoverable under the lien was to be determined by the subcontractor's bargaining agreement obligations, the lien foreclosure action was purely a creature of state law. Again there was no direct agreement between the union and the general contractor, nor was there any attempt by the general contractor to ensure prompt performance by the union's members.

Whatever the precise contours of Sundance's commitment to Union were, it was designed to maintain a work schedule and foster labor peace. Had Union taken out an insurance policy against Strom's default, no one could be heard to argue the insurance company had an "employment agreement" with Union. But Sundance's self-interest takes this case out of that paradigm. And that, given the expansive conception of Section 301 employer-employee relationships mandated by *Hearst* and *Retail Clerks*, brings this action within the statute's terms.[10]

By the logic of the just-announced holding, Union's Section 301 action against Sundance is limited to seeking construction and enforcement of the direct Union-Sundance agreement as it may be established at trial. Union cannot seek to enforce the CBA itself. Therefore Count II, to the extent predicated on direct enforcement of the CBA, is dismissed pro tanto.

### Fund Payments

Viewed in the light most favorable to plaintiffs, Sundance's statements amounted to a guaranty of Strom's Fund obligations. Strom having failed to meet those obligations, Funds say ERISA § 502 ("Section 502"), 29 U.S.C. § 1132 and ERISA § 515 ("Section 515"), 29 U.S.C. § 1145 provide a cause of action to recover Fund payments from Sundance.

Section 502(a) reads in part:

A civil action may be brought—

\* \* \* \* \* \*

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

Section 515 provides the substantive violation on which a Section 502(a)(3)(B)(ii) action might be based here:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Finally (and most importantly for Funds) Section 502(g)(2) permits courts to award (1) unpaid contributions, (2) interest on those unpaid contributions, (3) liquidated damages of up to 20% of the unpaid contributions, (4) attorneys' fees and (5) other appropriate legal or equitable relief—if the Section 502(a)(3) action is predicated on a Section 515 violation.

Funds urge Sundance is liable under ERISA because it adopted the CBA and thus became an "employer" party to the various multiemployer trust instruments incorporated into the CBA. That notion has as little force here as it did under this opinion's Section 301 analysis, and it must once again be rejected. Nothing more than Funds' conclusory allegations supports the idea Sundance adopted the CBA (see *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th

---

**10.** This conclusion makes it unnecesary to consider the possibility of Section 301 jurisdiction over Sundance even absent an "employment relationship." After all, jurisdiction under that Section unquestionably extends to the Union-Strom dispute. That at least raises the possibility (discussed neither by plaintiffs nor by Sundance) of pendent-party jurisdiction over the closely-related Union-Sundance controversy (see *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 187 (7th Cir.1984), confirming the continued viability of pendent-party jurisdiction annexed to federal-question cases).

Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983) (nonmovant must "set forth specific facts showing that there is a genuine issue for trial")).

With that argument out of the way, Sundance raises two distinct questions:

1. whether Sundance is a proper party defendant under ERISA; and

2. whether the absence of a written Union-Sundance agreement bars any Sundance payments to Funds.

Each impacts in a different way on Sundance's claimed duty to pay Funds.

■ As to ERISA, Sundance once again argues it is not an "employer," so it may not be held liable under Section 515. Though the comparable argument was not persuasive for Section 301 purposes, it may be here. ERISA § 3(5), 29 U.S.C. § 1002(5) defines "employer" as:

> any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan....

In terms, that reads more narrowly than *Hearst*'s Section 301 approach. At least one court has squarely held Section 515 does not permit suits against an employer's surety, which is neither a "direct" employer nor a person acting "in the interest of" an employer (the theory being the surety acts in the interest of those damaged by the employer's failure to pay). *Carpenters Southern California Administrative Corp. v. D & L Camp Construction Co.,* 738 F.2d 999, 1000–01 (9th Cir.1984). Similarly Section 515 does not give a right of action against a non-signatory general contractor on a mechanics' lien theory when the subcontractor defaults on its ERISA obligations (*Majestic Housing,* 743 F.2d at 1346):

> [Such a general contractor] is in a position similar to a surety in that it is a non-party to the bargaining agreement that is made responsible by the operation of state law for the failed obligations of the employer. And, as in *Camp Construction,* we find no evidence in the legislative history of ERISA or its 1980 amendments that a non-signatory proper-

ty owner whose holdings are subject to a state mechanic's lien was intended as a proper defendant in an action to enforce the employer's obligations. ·

Both *Camp Construction* and *Majestic Housing* stressed the state-law origin of the non-employer's obligation to pay. More importantly for current purposes, however, neither case showed any inclination to enlarge the ERISA definition of "employer" to embrace a person obligated to stand behind a "direct employer's" obligations to make Fund contributions. That nonexpansive approach also draws force from ERISA's legislative history. In discussing the need for Section 515 (added to ERISA as part of the 1980 amendments), Senator Williams said (126 Cong.Rec. 20,-180 (1980)):

> It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises. Further, plan participants for whom the employer promises to make pension contributions for the plan in exchange for their labor are entitled to rely on their employer's promises. The bill clarifies the law in this regard by providing a direct ERISA cause of action against a delinquent employer without regard to extraneous claims or defenses.

And in the House, sponsor Representative Thompson said (*id.* at 23,039):

> Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law, other than 29 U.S.C. 186.

Those two statements (and see also Sen. Williams' "remarks"—doubtless unspoken and simply inserted into the Congressional Record—echoing the just-quoted statement

by Rep. Thompson, 126 Cong.Rec. 23,288 (1980)) place emphasis on:

1. the *"employer's* promise" to pay

2. pursuant to its obligations under a plan

3. that defines the employer's obligations and does not involve extraneous, unrelated issues.

Further, the remarks expressly incorporate the requirement of 29 U.S.C. § 186 (of which more later) that employer contributions to trust funds be pursuant to a written plan.

Sundance's obligations are not defined by the CBA or its incorporated trust instruments as such. Instead they are defined by the terms of Sundance's agreement with Union, the scope of which is an issue wholly "extraneous" to the terms of Union's plans. In similar manner, a surety's or lienee's obligation to pay into a plan is not prescribed within the plan's four corners either. And note too Rep. Thompson's comments expressly refer to the complications of *federal* labor law, a concept broader than the *Camp Construction* and *Majestic Housing* references to state-law complexities.

Section 515 is specifically designed to give a right of action against a plan signatory to enforce the plan's terms. That is the sort of uncomplicated, straightforward action Congress wanted to promote.

*Indiana State Council of Roofers Health and Welfare Fund v. Adams Roofing Co.,* 753 F.2d 561, 563–64 (7th Cir.1985) makes plain such an action was intended to complement the independently viable Section 301 lawsuit for breach of a collective bargaining agreement's requirement to contribute to a plan:

[In *Bugher v. Feightner,* 722 F.2d 1356 (7th Cir.1983), *cert. denied,* [— U.S. ——] 105 S.Ct. 98 [83 L.Ed.2d 43] (1984) t]his court acknowledged that section 502(a)(3), permitting fund trustees to sue for equitable relief, did not supplant section 301 of the Labor Management Relations Act. As we stated, "a review of the statutory scheme and legislative history of ERISA demonstrates that [Section 502(a)(3)] was intended to supplement rather than supersede the rights existing under [Section 301]." *Id.* at 1359. Thus, the clear language of section 515 and the decisions of the Supreme Court and this court delineating the relationship between ERISA and the Labor Management Relations Act require us to look to the terms of the trust agreement to determine if defendants are liable for delinquent contributions to the fund.

Thus the supplementary ERISA action under Sections 502 and 515 must be one to enforce the terms of the plan agreement itself. And that should carry with it the corollary notion that the proper litigants must be the parties to the plan agreement—a corollary especially important because of the ERISA action's special rights of recovery, such as attorneys' fees and liquidated damages.

In sum, it may turn out Sundance is liable to make payments to Funds. But such liability, though perhaps *measured by* the Funds' trust-agreement terms, does not *arise from* those terms. It could derive only from Sundance's oral promises to back up Strom's Fund liabilities, promises extraneous to the Funds' trust agreements as well as to the CBA. Although Strom is a proper ERISA defendant, Sundance is liable (if at all) for breach of contract only under Section 301.[11]

---

**11.** Though Section 301(a) vests jurisdiction over suits for violation of contracts where the contracting parties are an "employer" and a "labor organization," it does not require that the litigants be limited to those parties. See, e.g., *Smith v. Evening News Ass'n,* 371 U.S. 195, 200–01, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962); *Pattern Makers' Pension Trust Fund v. Badger Pattern Works, Inc.,* 615 F.Supp. 792, 800 (N.D. Ill.1985). Hence Section 301 jurisdiction may encompass a suit by Funds (as third-party beneficiaries of the Sundance-to-Union promises), so it is inappropriate to dismiss Funds and their Trustees as co-plaintiffs. But whether or not Funds and their Trustees ultimately remain in the case, Union's Section 301 claim should extend to enforcing Sundance's promise to pay Funds (subject to the consideration next discussed in the text).

Sundance advances a second objection to its liability to pay Funds: Because its agreement with Union was oral, contributions to the Funds are barred by LMRA § 302 ("Section 302"), 29 U.S.C. § 186. Section 302(a) creates a sweeping general rule:

(a) It shall be unlawful for any employer or association of employers or any person who acts ... in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce....

That prohibition is designed to prevent bribery, extortion and corruption of the collective bargaining process (*United States v. Kramer*, 355 F.2d 891, 896 (7th Cir.), *vacated in irrelevant part and cert. denied in part*, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966)). But the value of employer-funded pension plans moved Congress to create the Section 302(c) exception:

The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer ... *Provided*, that ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer....

Sundance argues even if it agreed orally to pay Strom's Fund obligations, that agreement is not within Section 302(c). Of course Sundance's very reliance on Section 302 involves at least a facial self-contradiction, for Section 302(a) forbids only "employers" from making payments to the union representatives of their "employees," and Sundance has argued all along it is not the employer of Strom's employees. But because this opinion's Section 301 analysis has shown a species of employment relationship can be said to exist between Sundance and the carpenters, this Court will pass over the contradiction.

Section 302(c)(5)(B)'s requirement of a detailed written agreement was intended to prevent abuse of trust funds by union fiduciaries. *Bricklayers, Masons & Plasterers International Union of America, Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1025 (5th Cir.1975) tells us:

Senator Taft, a principal architect of the legislation, explained in the debates that "the purpose of the provision is that the welfare fund shall be a *perfectly definite* fund, that its purpose shall be that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee." 93 Cong.Rec. 4876 (1947) (emphasis added).

Despite that employee-protective purpose, enforcement of the statute has led at times to harsh results. See *Moglia v. Geoghegan*, 403 F.2d 110, 116–17 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969) (statute requires denial of pension benefits to 28-year employee of employer that made contributions to trust fund without ever having signed a written agreement; nor does statutory language permit application of equitable estoppel); see also *Walsh v. Schlecht*, 429 U.S. 401, 409 n. 5, 97 S.Ct. 679, 686 n. 5, 50 L.Ed.2d 641 (1977) (outlining the harsh facts leading to the *Moglia* result, but not questioning it).

Plaintiffs respond by pointing to written agreements: the CBA and its incorporated trust instruments. They correctly say that even if Sundance is not a direct signatory to any of those documents, the mere existence of the documents serves the congressional purpose underlying Section 302(c)(5)(B), for they spell out the terms of the carpenters' rights and control Union abuse. That, however, is not dispositive, because the statutory exception requires not only a "written agreement" but one "with the employer." And this time it is plaintiffs that cannot have it both ways: If Sundance is an "employer" for trust fund

purposes, it must also be the "employer" with whom the written agreement was signed. It was not.

Congress created an exception to Section 302(a)'s general prohibition only on the condition specific prerequisites were met. It did not—as it might—grant courts authority to approve payments to union funds if judges thought employees' interests were adequately protected. This Court is not free to depart from the letter of Section 302(c)(5)(B)—requiring the payor to have signed a written agreement—simply because of a feeling the purposes of the statute are adequately served.

Sundance is not home free, though. Once again the parties' contested versions of the Union-Sundance agreement bar summary judgment here. If and to the extent Sundance agreed to shepherd Strom's money and see it was directed to Funds, it is surely fair to characterize Strom as still the actual payor of that money to Funds—and Strom *did* sign the written agreements. And if and to the extent the Union-Sundance agreement required the latter to pay its own money to Funds, the lack of Sundance's signature to a written agreement might or might not be fatal. There is a line of cases holding Section 302(c)(5)(B) is not violated when a successor employer makes payments to a trust fund pursuant to an expired written plan. See, e.g., *Carter v. CMTA–Molders & Allied Health & Welfare Trust*, 736 F.2d 1310, 1313 (9th Cir.1984). Neither side has discussed whether the existence or the rationale of those cases would support suit against nonsigner Sundance here. That question must remain open for the present.

Thus the question whether section 302(c)(5)(B) bars payments from Sundance to Funds can be resolved only after the parties address the last-described legal question and, in any event, after a trial determines the scope of Sundance's commitment under the parties' agreement. Summary judgment at this stage is inappropriate.

*Conclusion*

Sundance's motion is granted in part and denied in part:

1. Plaintiffs' claim that Sundance adopted the CBA and is bound by all its terms is dismissed.

2. Plaintiffs' ERISA action to recover Fund payments from Sundance is dismissed.

3. Sundance's motion is denied in all other respects.

At the next status date the litigants will be expected to address the procedures necessary to bring the case to trial on the surviving claims.