Marie Louise GORSKI, etc., Plaintiff,

v.

**LOCAL UNION 134, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Defendant.**

No. 85 C 05352.

United States District Court,
N.D. Illinois, E.D.

May 14, 1986.

Benjamin P. Hyink, Drugas, Morgan & Hyink, Chicago, Ill., for plaintiff.

Robert E. Fitzgerald, Jr., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Marie Louise Gorski ("Gorski")[1] initially sued Federal Signal Corporation ("Signal") and Local Union No. 134, IBEW ("Union") under Labor Management Relations Act ("LMRA") § 301 ("Section 301"), 29 U.S.C. § 185, claiming:

1. Signal breached its collective bargaining agreement (the "CBA") with Union by unilaterally reclassifying jobs after the CBA-established cutoff date for such reclassification.

2. Union breached its duty of fair representation toward Signal employees by conspiring with Signal to allow the job reclassifications.

Thereafter Gorski filed a first amended complaint (the "Complaint"), dropping Signal as a party defendant but reasserting her claims against Union.

This Court has inherited the case[2] with a fully-briefed motion by Union:

1. to dismiss under Fed.R.Civ.P. ("Rules") 12(b)(1), (2) and (6); or

2. for summary judgment under Rule 56; or

3. to strike Gorski's prayer for punitive damages.[3]

Treated as a Rule 12(b)(6) motion to dismiss,[4] the motion is granted.

### Facts [5]

Signal and Union entered into the CBA December 28, 1981 (¶ 12). Gorski is a Signal employee and Union member subject to the CBA (¶¶ 8, 10). In part the CBA establishes job classifications and corresponding wage rates for Signal's hourly employees (Ex. 1 at 38–46, 52–60). CBA § 22.1 ("Section 22.1") sets the terms on which Signal may add or revise job classifications (id. at 36):

> After a new or revised job classification has been established for a period of thirty (30) days, the Union may within the following thirty (30) days discuss this new or revised job classification and rate of pay and the effective dates for the rate of pay with the Company. Where the parties cannot agree upon the new or revised job classification and/or applicable rate, the Union may file a grievance at Step (c) of the grievance procedure. If such grievance thereafter goes to arbitration, the arbitrator shall only determine whether the rate for the new or revised job classification bears a fair and equitable relationship to existing rates.

When Signal and Union executed the CBA, Signal had a plant in Blue Island, Illinois (¶ 13). However, the CBA contemplated a possible move from that location,

---

**1.** This action has been styled as one on behalf of Gorski and others similarly situated, and Gorski's Complaint asked for class-action certification (a question addressed later in this opinion).

**2.** Originally this action was assigned to this Court's colleague Judge George Leighton. Upon Judge Leighton's recently taking senior status, the suit was reassigned to this Court's calendar.

**3.** Gorski Mem. 20 has withdrawn her punitive damages claim, mooting Union's motion to strike.

**4.** Neither side has submitted the statements of undisputed and disputed facts required in all summary judgment motions by this District Court's General Rules 12(e) and (f). While that

omission does not absolutely preclude consideration of Union's summary judgment motion (see, e.g., *Chicago District Council of Carpenters Pension Fund v. Strom*, 634 F.Supp. 163 (N.D.Ill. 1986)), neither side appears to have undertaken discovery as yet, and most of Union's arguments are really addressed to the sufficiency of the Complaint. This opinion therefore follows the Rule 12(b)(6) rather than the Rule 56 route (see the concluding sentence of Rule 12(b)).

**5.** Rule 12(b)(6) principles require this Court to accept as true the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in Gorski's favor. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985). All citations to the Complaint will simply take the form "¶—" or "Ex.—."

for CBA § 22.2 ("Section 22.2") provides (Ex. 1 at 36):

> If during the term of this Agreement, the Company transfers any or all of its Blue Island operations to a location within the Greater Metropolitan Area of Chicago, the provision of Section 22.1 above shall not apply. The foregoing shall become effective with the installation of the first operation installed at the new location and shall end two (2) years after the last operation has been moved to the new location or upon the termination date of this Agreement, whichever date occurs the sooner; unless extended by agreement between the Company and the Union.

Signal in fact moved its Blue Island operations to Chicago. In March or April 1985 (presumably after the two-year deadline had passed, else there would be no current dispute [6]) Union Business Manager William Neylon ("Neylon") agreed on Union's behalf to extend the job reclassification period (¶ 14). In so doing, Neylon did not consult Union's Executive Board (*id.*), nor had he read the CBA and familiarized himself with Section 22.1 (¶ 23).

On April 29, 1985 Neylon asked Union's members to vote in favor of opening contract discussions with Signal (¶ 15). Along with a simple yes/no ballot, Neylon circulated the following explanation (Ex. 3, emphasis in original):

> A. A YES VOTE—You agree to allow management and your Union representatives to meet and discuss the proposals of the management for a new contract *without opening the current contract*. You also agree that if your representatives and the management arrive at any *mutually* agreeable proposals, *only then* would an additional new vote be taken to consider a re-opening of the contract. Additionally, you agree to delay your May 1st 4% increase

while these discussions are in progress, until either a new agreement is reached, voted upon, and accepted or, if no agreement is accepted by July 1, 1985, the wages and the job reclassifications would be enacted retroactive to May 1st.

> B. A NO VOTE—You do not agree to discussions now, nor do you agree to the suspension of your May 1st 4% increase. Therefore, the company would not only pay the 4% increase as of May 1st, but also proceed with its job reclassifications, including accompanying wage adjustments.

Gorski believes the vote was 361 "no" to 31 "yes" (¶ 15).

Nevertheless some Union-Signal discussions took place, for on May 9 Signal's Acting Plant Manager Jim Lemmons ("Lemmons") sent Union Shop Steward Don Davis ("Davis") the following letter (Ex. 4):

> Don,

> It has been alleged that you, on Monday, May 6, 1985, notified numerous people in the factory that their new rate of pay would be $6.84/hour. I hope this is not true, but is clear the employees have information as to the amount of this rate.

> It is important that you recognize our expectations of your role as steward. This information was privileged until officially released by the Company Management to the workers. Advance notice has created unnecessary anguish for some employees who were not affected.

> I would appreciate hearing back from you in writing as to this allegation.

Then on May 13 Signal announced a job reclassification resulting in pay or benefits cuts for some 45% of CBA-covered employees (¶¶ 17, 24). Within 48 hours many Signal employees grieved that reclassification under the first step of the CBA grievance

---

**6.** Nothing of record indicates the date the move to Chicago occurred, but the reclassification was obviously untimely in Section 22.2 terms.

procedure (¶ 19).[7] Receiving no relief at that step, the employees submitted a written grievance to a Signal officer and Chief Union Steward T. Pesavento ("Pesavento"). Pesavento refused to accept the grievance or to pursue it (¶ 19).

Neylon submitted a new ballot to Union members May 24 for a proposed May 28 meeting and May 29 vote (¶ 20). That ballot read (Ex. 5):

GIVE THE UNION REPS THE RIGHT TO GO IN AND TALK TO THE COMPANY ABOUT THE CONTRACT IN AFFECT MAY 7, 1985. IF SOMETHING COMES OUT OF THESE TALKS THE PEOPLE WILL HAVE THE RIGHT TO VOTE WHETHER TO ACCEPT OR REJECT THE PROPOSAL.

☐ YES ☐ NO

But on May 28 Neylon cancelled the proposed meeting, and on May 29 he asked Union's stewards to obtain the view of each Union member personally (¶ 20).

Signal denied the grievances June 3 (¶ 21).[8] Later that month Neylon held a meeting with Union members at which he admitted he had not read the CBA before agreeing to extend the job-reclassification period (¶ 23).

### Contentions of the Parties

Gorski seeks principally the difference between her actual income and benefits received since May 13, 1985 and what she would have received absent the job reclassification.[9] Her theory of Union's liability is (¶ 30):

As a result of SIGNAL's wholesale job reclassification adversely affecting plaintiff, and all others similarly situated, defendant, [Union], breached its statutory duty of fair representation owing to plaintiff, and all others similarly situated, as alleged above....

Even aside from the causal ambiguity in that statement,[10] the Complaint does not clearly single out the acts on which Gorski bases her claim. Several of the Complaint's allegations initially carried that potential:

1. Neylon had no authority to agree on Union's behalf to extend the Section 22.1 job reclassification period (¶ 18).

2. Pesavento "arbitrarily refused" to accept or pursue the grievances (¶ 19).

3. Union "unlawfully permitted" Signal to reclassify jobs (¶ 22).

4. Union's negotiations with Signal over the grievances were (id.):

spurious, carried on in bad faith, and were deliberately designed to aid SIGNAL in creating new job classifications....

5. Neylon had not read the CBA before agreeing to extend the Section 22.1 reclassification period (¶ 23).

6. Union's agreement to extend the job reclassification period foreclosed employees' rights to grieve their reclassifications (¶ 24).

Gorski's Mem. 4–5 narrows down the scope of her Complaint considerably:

It is vital to note from the start that the breach of the duty of fair representation,

---

7. Gorski does not say whether or not she was among those grievants.

8. Though the text of this opinion has tracked the text of the Complaint (see n. 5), there are some internal inconsistencies between the Complaint's allegations and its Exhibits. Complaint ¶ 21 says its Ex. 6 is "[a] true and correct photocopy of the standard grievance denied." That Exhibit is a May 14 grievance brought by Vince Ahern ("Ahern") denied May 29 with the response:

GRIEVANCE REJECTED AS NOT PROPERLY BROUGHT UNDER CONTRACT.

From its date Ahern's grievance really appears to be a first-step grievance brought soon after

the May 13 job reclassification. And the denial date does not jibe with Gorski's June 3 assertion. Further, Ahern's grievance was countersigned by Union representative Donald Davis, so it is not clear whether it was one refused by Pesavento. None of those factors, however, is material to the current discussion.

9. She also asks for attorneys' fees and "such other and further relief as may be appropriate."

10. Was the breach a *result* of the reclassification, as the Complaint literally says, or its *cause*?

upon which this action is based, arises solely from the manner in which [Union] arrived at its decision to extend the time period provided for in the CBA for SIGNAL's job reclassification. The breach herein complained of in no way relates to [Union's] conduct with regard to the grievances made by GORSKI and the others. The case at bar, simply stated, presents a situation in which [Union] arrived at a decision of great import to the employment rights under the CBA of GORSKI and all others similarly situated in an arbitrary and wrongful fashion and in a manner wholly lacking in rational consideration. It is this conduct of [Union] which constitutes the breach of the statutory duty of fair representation sued upon in this case.

And *id.* 6 supplies more specifics:

In the instant case, the conduct of NEYLON, in agreeing on behalf of [Union] to extend the time period in which SIGNAL could establish new job classifications, without inquiring into the collective bargaining unit's rights under the CBA and without being familiar with the provisions of the CBA at issue, was arbitrary and wrongful and, therefore, constituted a breach of the statutory duty of fair representation.

That exposition brings the Complaint into better focus. Union retorts with several arguments:

1. This Court lacks subject-matter jurisdiction because Gorski and her potential class members have not exhausted the CBA grievance procedures.

2. Gorski lacks standing to bring this suit because she does not assert a "uniquely personal right."

3. Federal jurisdiction under Section 301 is lacking because Gorski does not allege the *breach* of a contract between an employer and a labor organization.

4. Signal is a necessary party and its absence requires dismissal.

5. Neylon's failure to read the CBA does not rise to a breach of Union's duty of fair representation.

6. Gorski has not exhausted Union's internal grievance procedures, as she must before suing Union.

Not all those contentions have merit. But one does, and it is enough to require dismissal. Though subject-matter jurisdiction is normally a threshold question, discussion of that issue will be clearer once the statutory duty of fair representation is addressed, so this opinion will take up that topic first.

*Fair Representation*

National Labor Relations Act ("NLRA") § 9(a) ("Section 9(a)"), 29 U.S.C. § 159(a) provides:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining....

Exclusive representation gives significant power to an employee majority over the minority and creates a potential for abuse if the bargaining representatives favor those who elected them over those who voted for someone else. In light of that potential, *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 (1967) (citation omitted) held Section 9(a) is instinct with a duty of fair representation:

Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

Indeed the NLRA-based notion of fair representation had emerged early on (*Wallace Corp. v. NLRB*, 323 U.S. 248, 255–56, 65 S.Ct. 238, 241–42, 89 L.Ed. 216 (1944)):

The duties of a bargaining agent selected under the terms of the Act extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, it has become the agent of all the

employees, charged with the responsibility of representing their interests fairly and impartially. Otherwise, employees who are not members of a selected union at the time it is chosen by the majority would be left without adequate representation.

Thus the duty of fair representation originated as an antidiscrimination concept—much like an implied equal protection clause—emanating from Section 9(a). Though developed in a race-discrimination context (see *Vaca*, 386 U.S. at 177, 87 S.Ct. at 909–10), the duty is not limited to such situations. It was evolved (*Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971)):

> to enforce fully the important principle that no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers.

Two principles are implicit in the above discussion. Each bears on this case.

■ First, lawsuits charging breach of the duty of fair representation cannot be based solely on actions or omissions that *result* in unfairness to an employee. At least in this Circuit, *intent* to cause harm is the gravamen of the action: There is no breach without "substantial evidence of fraud, deceitful action or dishonest conduct" (*Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir.1981)). *Camacho v. Ritz-Carlton Water Tower*, 786 F.2d 242, 244 (7th Cir.1986) (citations omitted) has again expressly rejected the idea the duty of fair representation can be breached under a mere causation standard or even by gross negligence:

> A union may be liable if it discriminates against employees for forbidden reasons (such as race or politics, including the employee's position on the union and its leaders). It is not liable, however, for careless or bone-headed conduct. When

the prohibition is directed against the motive rather than the result, it is necessary to use the standard of intent or recklessness (from which intent may be inferred).

■ Thus the fact a union action harmed an employee is not, without more, enough to establish a breach of the duty of fair representation. That action must have been one the union would not have taken toward another similarly-situated employee or group of employees. Fair representation thus draws a distinction (*Lockridge*, 403 U.S. at 301, 91 S.Ct. at 1925):

> between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other. . . .

■ Second and relatedly, a breach of the duty of fair representation thus requires some sort of discrimination—that is, disparate treatment. Majorities may not take benefits for themselves that they deny to minorities (or individuals), nor may they force on others obligations they are not willing to shoulder themselves. But if the union simply strikes a bad bargain with the employer—one that is bad for all employees—that is not discriminatory. Section 9(a)'s grant of exclusive bargaining power to the majority-chosen representative, as *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) said:

> requires them to make an honest effort to serve the interests of all those members, without hostility to any.

If the union simply turns out to be an incompetent negotiator and concedes a point that reduces benefits to all bargaining-unit members, it has not abused its majority position, for the majority and minority alike suffer.[11] In other words, Section 9(a) imports a duty to deal fairly, not a duty to deal competently.

---

11. Of course employment-discrimination law provides many examples of apparently uniform actions that have a disparate impact on minorities. But as *Hoffman* and *Camacho* make plain, disparate impact is not enough to ground a duty-of-fair-representation suit: Only intentional discrimination will suffice.

■ As already indicated, that analysis goes hand-in-glove with the first point. Fair representation, as *Camacho*, 786 F.2d at 244–46 says at some length, is a matter of intent and not effect. Through incompetence or negligence the majority may in fact give itself a bad deal, but it is unreasonable to draw the inference it intends to do itself harm. No duty to protect against across-the-board bad deals need be implied from Section 9(a), for those injured have a remedy already to hand: They may vote out the inadequate union and vote in a better one. Fair representation duties arise because that remedy is realistically unavailable when a minority is *specially* disadvantaged.

Against that backdrop, Gorski's suit faces at least two serious stumbling blocks. Though her problems may well be apparent from the two-point analysis just outlined, some elaboration may be useful.

In the first place, Gorski says she fell victim to job reclassification because Neylon failed to read the CBA before agreeing, on Union's behalf, to extend the Section 22.2 time period. Had he read Section 22.2, he presumably would have known his agreement—which he was not obliged to give—operated to exempt any later job reclassifications from the Section 22.1 arbitration rights. And in the circumstances Gorski says Neylon's failure to familiarize himself with the CBA was "arbitrary and wrongful," hence a breach of the duty of fair representation.

But Gorski's legal characterization of the facts is not what counts (*Prudential Insurance Co. of America v. Sipula*, 776 F.2d 157, 159 (7th Cir.1985)). Neylon's behavior may have been "arbitrary and wrongful" (a legal conclusion that tracks the cases' language, though it does not reflect the context in which that language is used), but nothing supports the inference the arbitrariness or wrongfulness reflected any hostile or discriminatory intent on Neylon's part. On the contrary, Gorski does not say Neylon's blunder stemmed from any axe he sought to grind. Indeed, Gorski's attribution of Neylon's agreement to his simple failure to read the CBA and to familiarize himself with the way Sections 22.1 and 22.2 operate leads to precisely the opposite inference: Had he not been lazy or negligent, he would not have made the agreement.

■ There is thus no predicate for any inference that Neylon purposely shielded himself from the CBA so as to arm himself with the weapon of ignorance. As *Cote v. Eagle Stores, Inc.*, 688 F.2d 32, 34 (7th Cir.1982) (per curiam) put it:

> According to *Hoffman*, an aggrieved union member will prevail on a claim that the union breached its duty of fair representation only upon proof that the union intentionally and severely discriminated against the member or that the union acted fraudulently or deceitfully.

Even if all Gorski's factual allegations about Neylon's actions are accepted as true, Gorski still has said nothing about intentional discrimination, fraud or deceit. "Bone-headed" (see *Camacho*, 786 F.2d at 244) is perhaps the most reasonable characterization.

Of course complaints are to be read most liberally. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) teaches:

> A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

But as this opinion has already noted, Gorski's own version of cause and effect here is inconsistent with the necessary legal elements of intent, fraud or deceit. She says Neylon's act was arbitrary and wrongful *because* he failed to read the CBA. She does not say he failed to read the CBA and consented to Signal's time extension *because* of intentional discrimination, fraud or deceit. Indeed, if those were his aims, he hardly needed to omit reading the CBA to accomplish them. Gorski merely tries to pin on the undisputed events a label that, in itself, cannot transform the underlying facts. And those facts, as she herself has pleaded them, do not meet the *Hoffman-Cote-Camacho* test.

■ There is another independent (though related) stumbling block at which Gorski falls. This opinion has already explained breaches of the duty of fair representation must be discriminatory in some way. There must be an exercise of power inconsistent with the majority's obligation to deal fairly with the minority. Neylon's action, however, affected everyone in the bargaining unit: All jobs became subject to reclassification during the extended period. Though Gorski says only 45% of Signal's employees in fact were reclassified, she does not say that was a limit imposed by Neylon's agreement. In fact she says (¶ 15) Neylon agreed to permit "wholesale" reclassifications. That Signal ultimately decided to reduce the wages of only 45% of its employees is irrelevant to the nature of *Neylon's* action. And it is Neylon's action upon which Gorski says she is suing.

■ Neylon's agreement is therefore no different from any general agreement as to wages and benefits between a union and an employer. If one year's agreement provided (say) for a $5 per hour wage scale, and if the following year the employer convinced the union to take a cut to $4, that would mean employees' incomes were lower but it would not establish discrimination. As in that hypothetical example, Neylon's agreement did not give to some employees a benefit it denied to others. Instead it declared open season on all employees' jobs. It may be assumed (in Gorski's favor) Neylon did not agree to do that by accident. But his intentional agreement to subject *all* wages and benefits to adjustment was not, on the facts as alleged, intentionally *discriminatory*.

In sum, the picture painted by Gorski's Complaint and memorandum negates any cause of action against Union for breach of the duty of fair representation. That requires dismissal on Rule 12(b)(6) grounds.

### Federal Subject Matter Jurisdiction

Although Gorski's Complaint cannot survive Union's Rule 12(b)(6) challenge, it remains appropriate to consider Union's jurisdictional attack. Orderly jurisprudence teaches if the Complaint could be dismissed under Rule 12(b)(1) at the outset, it should be.[12] See *Kanzelberger v. Kanzelberger,* 782 F.2d 774, 777 (7th Cir.1986).

■ Union first says Section 301 provides no jurisdictional linchpin here because Gorski has not alleged violation of any Union-Signal contract. Section 301 provides:

(a) Suits for violation of contracts between an employer and a labor organization ... may be brought in any district court of the United States having jurisdiction of the parties....

What the Complaint says is Neylon (on Union's behalf) assented to a prolongation of the job reclassification period. Section 22.2 expressly provides Signal could still reclassify jobs if the two-year window were thus extended by agreement. By definition, then, Signal did not breach the CBA by reclassifying jobs more than two years after the move from Blue Island. And though the Complaint does charge Neylon had no authority to consent on Union's behalf, Section 301(b) expressly provides unions shall be bound by the acts of their agents. Further, Gorski says Neylon's agreement was effective to surrender her Section 22.1 grievance rights. That could be so only if the agreement were valid.

As between Union and Signal, then, no breach of an employer-labor organization contract appears in the Complaint. Section 301 is therefore inapplicable (*Leskiw v. Local 1470, IBEW,* 464 F.2d 721, 722–23 (3d Cir.1972)).

■ But there is an alternative jurisdictional route. Fair representation is a duty derived from Section 9(a). Breach of that duty is perforce a breach of that Section. Courts that have considered the question (which *Leskiw* did not) have uniformly held a duty-of-fair-representation breach of Sec-

**12.** Union's motion raises not only subject matter jurisdiction but also lack of personal jurisdiction under Rule 12(b)(2). Because Union offers nothing in support of that contention, this Court need not reach it.

tion 9(a) is directly actionable either under 28 U.S.C. § 1337 ("Section 1337")[13] (*Anderson v. United Paperworkers International Union,* 641 F.2d 574, 576 (8th Cir. 1981); *International Brotherhood of Teamsters, Local No. 310 v. NLRB,* 587 F.2d 1176, 1181 n. 21 (D.C.Cir.1978)) or the general federal-question provision, 28 U.S.C. § 1331 ("Section 1331") (*Karahalios v. Defense Language Institute Foreign Language Center Presidio,* 544 F.Supp. 77, 79 (N.D.Cal.1982)).[14] See also *Baker v. Newspaper & Graphic Communications Union, Local 6,* 628 F.2d 156, 164–65 (D.C. Cir.1980) (basing duty-of-fair-representation action on Section 9(a) without identifying a specific jurisdictional provision).

True enough, in the usual fair-representation case an employee aggrieved by an employer's action will sue both employer and union under Section 301's umbrella. In fact an employee can sue an employer under Section 301 only if the employee is at the same time claiming a breach of the duty of fair representation (*United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1563–64, 67 L.Ed.2d 732 (1981)). Otherwise an employee is not entitled to circumvent the exclusive bargaining agent and sue on his or her own behalf.

But even in such "hybrid" actions *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983) says it is wrong to conceive of the whole suit as one under Section 301 (footnote omitted):

> The suit against the employer rests on § 301, since the employee is alleging a breach of the collective-bargaining agree-

ment. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act.

It may thus be true most fair-representation cases are apparently brought under a general Section 301 claim, which requires a breach of contract between employer and union. But such a contractual predicate is not the sine qua non of fair representation cases, which have their own independent jurisdictional basis.

 That being true, Union is also wrong to say there is no federal jurisdiction absent an allegation Gorski has exhausted the CBA grievance procedures. See *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965) (employees asserting contract grievances must attempt to exhaust contract's grievance procedures before filing federal lawsuit). Gorski is not asserting a *contractual* grievance. Instead she says Union made a poorly-advised deal with Signal. As the fair-representation claim does not implicate the CBA, no recourse to the CBA's grievance procedures is required. At this time, Gorski has no grievance against Signal to press.

Union makes the added argument that Gorski is required to exhaust Union's own internal grievance procedures before she can file this suit. But exhaustion of internal union grievance procedures does not have the same mandatory character as exhaustion of CBA grievance procedures (where they apply). Courts have discretion

---

**13.** Section 1337 provides:

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce....

**14.** *Karahalios* involved federal employees subject to the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 7101 et seq. Its holding has been criticized in *Warren v. Local 1759, American Federation of Government Employees,* 764 F.2d 1395, 1399 (11th Cir.1985), to the extent *Karahalios* based jurisdiction under Section 1331 when the CSRA's own explicit duty-of-fair-representation provision (5 U.S.C. § 7114(a)) mandated admin-

istrative deferral. But *Warren* does not dictate a different result here because, absent a federal-employment situation, Section 1331 is clearly applicable. Only to the extent Section 1337 contains no amount-in-controversy requirement did it create (for commerce cases) a special exception to the strictures of general federal-question jurisdiction. But now that Section 1331 itself contains no amount-in-controversy limit, anything that could have been brought only under Section 1337 can be brought under Section 1331. See 13B Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 3574, at 235–36 (1984).

as to whether to require exhaustion of internal union grievance procedures, based on three factors, any one of which will excuse such exhaustion (*Clayton v. International Union, UAW*, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981)):

> [F]irst, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

Of course *Clayton's* factors are not directly applicable here, because this is not a hybrid Section 301/fair representation case. There is no relevant grievance to reinstate.

█ It is true Gorski has alleged some possible hostility on Union's part: Pesavento refused to accept the employees' grievances, and Neylon cancelled a general vote to ratify his actions. However, the dispositive factor here is Union has no internal grievance procedure capable of giving Gorski the sort of relief she seeks. Union has submitted a copy of its Constitution (Mem. Ex. 5) and pointed this Court's attention to its Article XXVII. But that Article merely provides for what *Orphan v. Furnco Construction Corp.*, 466 F.2d 795, 801 (7th Cir.1972) called "criminal-type prosecutions against Union members and officers charged with specified offenses." Union's Constitution would permit "conviction" of Neylon if he were found to have acted wrongfully, and he could be assessed a fine. Nothing in Article XXVII would en-title Gorski to receive the proceeds of such an assessment, and nothing provides the measure of such an assessment would be make-whole relief for Gorski and her proposed class members. In the context of a similar "punishment" procedure, *Orphan, id.* at 801–02 found there was no real "grievance" procedure to exhaust. That is equally so here.

Union's jurisdictional challenges therefore fail.[15] As this opinion has earlier stated, the problems requiring dismissal lie elsewhere.

### Class Action Certification

It might be thought dismissal of Gorski's Complaint moots her motion for class certification. Not so. Within the past month *Watkins v. Blinzinger*, 789 F.2d 474, 475–76 n. 3 (7th Cir.1986) has reiterated the principle that a class-certification decision must be made even though a court has already ruled in defendants' favor, particularly because knowing what the stakes are has an important impact on the decision whether or not to appeal.

Gorski filed her motion for class certification July 5, 1985. Judge Leighton entered a July 26, 1985 order—on Signal's motion—staying consideration of class certification. As already explained, this Court was assigned the case with that issue stayed and with the dispositive summary judgment motion ripe for decision. This is surely an awkward time (at best) to consider the factors relevant to class certification, which Rule 23(c)(1) directs be addressed "[a]s soon as practicable after the commencement of an action brought as a class action." Nonetheless *Watkins* teaches the issue cannot be ignored now.

---

15. As Gorski now construes her suit, Signal is plainly not a "necessary party," for she complains only of Union's failure to represent her interests fairly. Nor does Gorski lack standing for failure to assert a "uniquely personal right" as that concept is discussed in *Brown v. Sterling Aluminum Prods. Corp.*, 365 F.2d 651, 657 (8th Cir.1966). *Brown* held an individual employee could not assert *against an employer* a right possessed by the bargaining unit as a whole, for that would be a usurpation of the bargaining representative's exclusive Section 9(a) rights. Here Gorski asserts a claim against Union and not Signal. Though the whole bargaining unit was affected by Neylon's action, nothing in NLRA or LMRA grants exclusive rights over suits against unions for breaches of the duty of fair representation. *Brown's* standing analysis is wholly inapplicable here.

■ This Court finds no legitimate advantage to be served by certifying a class now. Certainly protection of potential class members' interests does not require it. Indeed on balance certification would tend to do them more harm than good. And under the circumstances Union does not merit the benefit that would flow to it from certification. All that is demonstrated by the following three-step analysis:

1. If a class *were* certified, the adverse decision on the merits would be res judicata as to its members as well as to Gorski. Though Gorski (for her own reasons) might decide an appeal is not worthwhile for her individually, attorneys for the class would then be obliged to consider on their own the class' interest in taking an appeal. Thus certification might force an otherwise unnecessary appeal, simply to protect the class.[16]

2. If a class *is not* certified and Gorski decides *not* to appeal, there would be no harm to the putative class members. First, this decision would not be res judicata as to them. Second, *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54, 103 S.Ct. 2392, 2397–98, 76 L.Ed.2d 628 (1983) teaches the statute of limitations as to putative class members' individual claims is tolled during the pendency of a class-certification motion. On the other hand, if Gorski *does* decide to appeal on her own, an unfavorable decision from the Court of Appeals would still not bind the uncertified putative class members, while a favorable decision would be available to them as a matter of offensive collateral estoppel.

3. As for Union's side of the balance, of course it has an interest *now* in class certification to foreclose further individual suits by potential class members. See *Watkins*, at 474–75 n. 3. But a defendant cannot fairly wait to have a certification motion deferred until it gets a favorable decision on the merits and then,

having as it were taken an option on obtaining class-wide claim preclusion, "put" that option when it knows exactly what it is worth. Rule 23 is not a vehicle for that kind of speculation. True enough, *Union* (as contrasted with Signal) did not move to defer class certification, and no reflection on its bona fides is intended here. But the effect of the delay caused by Signal's motion and Judge Leighton's deferral order cannot fairly accrue to Union now.

Gorski's motion to certify her suit as a class action is therefore denied. However because her motion was originally filed while this suit stood in a very different posture (before the merits had been addressed), and because Union has never had an opportunity to respond to the class-certification issue, Gorski is given until May 23, 1986 to move for reconsideration of that issue. Should Gorski so move, Union is ordered to respond on or before June 2, 1986.

### Conclusion

Union's Rule 12(b)(6) motion is granted, and Gorski's individual action is dismissed. Gorski's motion for class action certification is denied, but she is given until May 23, 1986 to move for reconsideration of that decision. If Gorski does move for reconsideration of her class certification motion, Union is ordered to respond on or before June 2, 1986. If she does not, this entire action will be dismissed on May 23 (without prejudice, of course, as to the putative class members).

■

---

**16.** By definition, whenever a class is involved lawyers have only the named plaintiff(s) with whom to consult. And when (as is hypothesized here) the named plaintiff has reached a personal decision adverse to the interests of the class, the lawyers are thrust into the uncomfortable (and conceptually undesirable) position of being both lawyers and clients.