**Pedro CAMACHO, Plaintiff-Appellant,**

v.

**RITZ-CARLTON WATER TOWER, a**
**partnership, Defendant-Appellee.**

**No. 85-1948.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1986.
Decided Feb. 3, 1986.

Kenneth N. Flazman, Chicago, Ill., for plaintiff-appellant.

Donald F. Peters, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Pedro Camacho was a waiter in the main dining room of the Ritz-Carlton Hotel in Chicago. One night he went home while diners were still at table, leaving only a busboy to care for the customers. The Hotel fired him. He filed a grievance, and his union (Hotel Employees and Restaurant Employees Union, Local 1, AFL–CIO) sent William Grossman, its business agent, to represent Camacho at a hearing.

The busboy recounted at the hearing that Camacho had left, just as the management said. Camacho replied that Sait Demir, a captain, had left for the evening and told Camacho that he could go too. Demir said that he had told Camacho that as the last waiter on duty he must stay until all customers had left. Demir explained that the Hotel requires at least one waiter to stay in the dining room to serve guests and reopen the check if guests order something more. Luis Acevado, the manager of the dining room, said that in firing Camacho he took account not only of this incident but also of Camacho's disciplinary record, which in-cluded two incidents of premature departure within five months before the discharge. On each occasion the Hotel gave Camacho a written warning; on neither did Camacho file a grievance. After hearing from these four people, the management refused to reinstate Camacho, and Grossman declined to take Camacho's case to arbitration.

Camacho maintains in this suit that Grossman was such an inferior advocate that the Union denied him the "fair representation" it is required to supply. See *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); cf. § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Grossman had not prepared for the grievance hearing, Camacho said, causing him to lose his meritorious case. There were two things Grossman should have done, according to Camacho. First, Grossman should have ascertained that the Hotel did not have a formal policy requiring waiters to remain in the dining room until all customers have left. Second, Grossman should have investigated the facts underlying the Hotel's earlier discipline of Camacho. Had he done this, Camacho insists, Grossman would have found these disciplinary citations unjustified and thereby removed an essential foundation of the discharge.

The Hotel pointed out that Grossman could not have reopened the earlier charges of misconduct because Camacho had not filed grievances concerning them. It moved for summary judgment, attaching extracts of depositions demonstrating that remaining at one's post is not only the Hotel's (unwritten) policy but also a "standard in the waiter's profession." The district court granted the motion—twice. After deciding in the Hotel's favor once, the court allowed Camacho to obtain new counsel and file an amended complaint. Then it granted the Hotel's renewed motion. Each time the district court concluded that Camacho had not raised a colorable claim that the Union committed "intentional misconduct," which under *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir.1981), is an

essential component of any suit attacking the adequacy of a union's representation. The district judge characterized Grossman's representation as "perfunctory," but he rightly concluded that "perfunctory" representation is a long way from "intentional misconduct"—which means sabotaging a "possibly meritorious grievance ... because the worker is on the outs with the union or is a member of some racial or other minority or is not a union man...." *Dober v. Roadway Express, Inc.*, 707 F.2d 292, 294 (7th Cir.1983).

Camacho presented no evidence that at the time of the grievance hearing he was on the outs with the Union. Surely he was on the outs with the Hotel, and perhaps the Hotel was seeking an excuse to get rid of him, but that is a different matter. The only evidence concerning Camacho and the Union is that five months after the hearing, Grossman told Demir "that Camacho had been causing a great deal of trouble." This "trouble," the district court pointed out, came from Camacho's unhappiness with the handling of his grievance; nothing suggests that Camacho and the Union were at odds at the time of the grievance, and so *Hoffman* seals Camacho's fate.

Camacho therefore asks us to overrule *Hoffman*, which he says is inconsistent with *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). The district court also "question[ed] the validity of the *Hoffman* standard in light of the clear direction the Supreme Court has provided on this issue in *Vaca* and *Hines....*" Camacho asks us to replace the rule of *Hoffman* with a causation standard: Did the Union's conduct cause the grievance process to err? Under this approach, perfunctory handling of a potentially meritorious grievance would be actionable.

We have so far declined all invitations to change the standard of *Hoffman*. See *Graf v. Elgin, Joliet & Eastern Ry.*, 697 F.2d 771 (7th Cir.1983); *Superczynski v. P.T.O. Services, Inc.*, 706 F.2d 200 (7th Cir.1983); *Dober, supra.* Although *Graf* hints that recklessness might substitute for intent, see 697 F.2d at 778–79, *Graf, Superczynski,* and *Dober* hold that gross negligence is not a basis of liability. A union may be liable if it discriminates against employees for forbidden reasons (such as race or politics, including the employee's position on the union and its leaders). It is not liable, however, for careless or boneheaded conduct. When the prohibition is directed against the motive rather than the result, it is necessary to use the standard of intent or recklessness (from which intent may be inferred). See *Duckworth v. Franzen*, 780 F.2d 645, 651–53 (7th Cir.1985); *Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

*Hoffman* and our subsequent cases adopt a standard based on prohibited intent because any other approach would embroil the courts in the merits of employment decisions. The grievance and arbitration machinery is designed to place review of discipline in specialized tribunals. Review of arbitral awards is close to nonexistent so long as the arbitrator interprets (as opposed to revises) the contract; the parties have bargained for non-judicial decisions and are entitled to rely on the decisions they receive. *Ethyl Corp. v. Steelworkers*, 768 F.2d 180 (7th Cir.1985). A court could not implement a standard based on causation—Did perfunctory handling cause an employee to lose a meritorious grievance? —without deciding which grievances are meritorious and which are not. That would move the locus of decision from the grievance-arbitration process to the courts, and the movement would both violate the contractual allocation of decisionmaking power and undermine the national policy favoring non-judicial disposition of labor disputes. See *Graf, supra,* 697 F.2d at 779–80.

The use of a standard based on causation or negligence also would interfere with employees' right to choose the level of care for which they are willing to pay. Business agents such as Grossman usually have many duties in addition to handling grievances. They are not lawyers or pri-

vate investigators. They may know the ins and outs of the collective bargaining agreement without having a trial lawyer's skills. A union could secure the skills and perseverance of a good litigation team only by paying the steep fees these skills command in the market. A union may choose to rely on part-time, untrained, overworked grievers—with the inevitable difference in the outcome of some cases—rather than purchase a higher quality of representation. A union may conclude that its limited resources should go into a strike fund or toward negotiating the next contract. "A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents", *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), and one part of this "wide range" is the choice between better grievance machinery and other things the employees value.

A union also might conclude that it is not in the interest of employees as a group to wage war against the employer over every grievance. More contentious procedures may alter the outcome of some cases, but a union sensibly may conclude—without violating the duty of fair representation that runs to all employees—that the employees as a group are better off displaying a cooperative and conciliatory spirit than showing arms in every encounter over a discharge. An unqualified prohibition of "perfunctory" representation would compel unions to change the allocation of their resources and to be more belicose. Both results would undercut employees' rights to control their own destiny; both could do more harm than good, as the employees see things. One unhappy outcome might be that employers, faced with the prospect of uniformly vigorous pursuit of grievances, might seek to reduce the employees' access to any grievance-handling machinery. *Vaca* held that unions may settle disputes short of arbitration, see 386 U.S. at 191–92, 87 S.Ct. at 917, in large part to preserve employees' control about how contentious their unions should be. True, the casual handling of grievances may not be what the employees want, but if perfunctory representation defeats rather than implements the wishes of the employees, they may install a new team of grievers. See *Dober, supra,* 707 F.2d at 295.

One final consideration supports *Hoffman*. This litigation is between Camacho and the Hotel, not between Camacho and the Union. The employer is liable for any damages preceding the time an arbitrator would have reinstated the employee, had the union done its duty. *Bowen v. United States Postal Service,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). So the employer has an interest in defending the Union's conduct, as it has done here. This is not altogether satisfactory, however, because the Hotel cannot readily determine why the Union did what it did. A union has little incentive to cooperate with its natural adversary in the course of litigation, once the plaintiff offers it practical immunity. The steep burden imposed by *Hoffman* helps to protect employers from the risk of error, a risk magnified when the employer must justify acts it may find inscrutable. *Hoffman* itself expressed worry about "collusive" suits in which the union assisted the employee to get a recovery from the employer by portraying itself as incompetent (658 F.2d at 522), and *Bowen* makes this less likely by reducing the maximum that the employer may be called on to pay to an employee. But *Bowen* does not prevent union and employee from ganging up against the employer or make it any easier for the employer to defend the union's conduct.

Against all of this Camacho offers *Hines*. That case holds that an arbitral award does not preclude litigation about the quality of the union's representation. The Court did not delineate when unions are liable. There are but hints. One passage states that when the union handles a grievance improperly "the focus is no longer on the reasons for the union's failure to act but on whether ... the employer breached the contract and whether there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings."

424 U.S. at 568, 96 S.Ct. at 1058. This does not support the "causation" test for which Camacho argues, however. It suggests that there must be a "breach of duty by the union" that *also* causes injury in the sense that the employee would have been vindicated but for the union's dereliction. Other passages in *Hines* repeatedly summarize the nature of the delict as one based on a lack of "good faith and honesty" (*id.* at 564, 96 S.Ct. at 1056), or "dishonest and bad faith representation" (*id.* at 565, 96 S.Ct. at 1056), or "bad faith" (*id.* at 566, 96 S.Ct. at 1057), or "malfeasance" (*id.* at 570, 96 S.Ct. at 1059).\* *Hines* did not consider the question we address today, but the language of *Hines* does not cast *Hoffman* to the wolves.

In some other circuits perfunctory handling of a meritorious grievance may subject a union to liability. See *Wyatt v. Interstate & Ocean Transportation Co.*, 623 F.2d 888, 891 (4th Cir.1980); *NLRB v. Postal Workers*, 618 F.2d 1249, 1255 (8th Cir. 1980); *Ethier v. United States Postal Service*, 590 F.2d 733, 737 n. 3 (8th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082, 1089 (9th Cir.1978); *Foust v. Electrical Workers*, 572 F.2d 710, 714–16 (10th Cir.1978), *rev'd on other grounds*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Ruzicka v. General Motors Corp.*, 523 F.2d 306 (6th Cir.1975), *modified*, 649 F.2d 1207 (1981), *cert. denied*, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983). Some of these courts may mean the same by "perfunctory representation" as we mean by "bad faith," but there is substantial disagreement all the same. These other courts have not performed to universal applause. See Michael C. Harper & Ira C. Lupu, *Fair Representation as Equal Protection*, 98 Harv.L.Rev. 1211, 1255–82 (1985). One day the Supreme Court will resolve these recurring differences, which have called forth at least ten published majority opinions plus several concurring and dissenting opinions in this circuit alone since 1981. Until that day, however, *Hoffman* stands.

AFFIRMED

CUDAHY, Circuit Judge, concurring in the result.

I have much earlier expressed my disapproval of the rule and reasoning of *Hoffman v. Lonza, Inc.*, 658 F.2d 519 (7th Cir.1981). See my separate opinions in *Hoffman* and *Dober v. Roadway Express, Inc.*, 707 F.2d 292 (7th Cir.1983). But *Hoffman* —however difficult it may be to square with *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) and *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)—is clearly the law of this circuit. *Hoffman* and its progeny appear to govern this case.

In any event, the reasons offered here by the majority for why the union membership is entitled only to a brand of representation worse than perfunctory are ingenious but unpersuasive. I am struck by the apparent need felt by a succession of judges over the years to defend, often at length, the not self-evidently correct *Hoffman* rule. See *Dober*, 707 F.2d at 294–95; *Superczynski v. P.T.O. Services, Inc.*, 706 F.2d 200, 202–03 (7th Cir.1983); *Graf v. Elgin, Joliet & Eastern Railway*, 697 F.2d 771, 779–80 (7th Cir.1983); *Hoffman*, 658 F.2d at 521–23. I would stand by my previously expressed views on this subject.

---

\* Camacho points out that "malfeasance" is followed by "or has otherwise caused the arbitral process to err" (*ibid.*), which, Camacho tells us, means that *Hines* adopts a test of simple causation. The full passage is: "Under the rule announced by the Court of Appeals, unless the employer is implicated in the Union's malfeasance or has otherwise caused the arbitral process to err, [employees] would have no remedy against [the employer]." The Court used "malfeasance" to refer to the sort of wrongdoing that would bring liability down on a union, and complicity in malfeasance or other causation (given the fact that a union is already liable) as wrongdoing that would bring liability down on an employer. The passage does not suggest that any old "cause" means that the union has violated its duty.