Stephen M. WUCSINA, Louis W. Parks, Mona Holdeman, Bruce Fisher, James L. Reed and Robert Shaw, Plaintiffs,

v.

RELIANCE ELECTRIC COMPANY, d/b/a Dodge Manufacturing, Dodge Manufacturing Company, United Steelworkers of America, AFL–CIO & CLC Local 1191, United Steelworkers of America, AFL–CIO & CLC, Defendants.

No. S 83–112.

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 21, 1986.

John C. Hamilton, South Bend, Ind., for plaintiffs.

Bruce G. Hearey, Cleveland, Ohio, Franklin A. Morse II, David R. Melton and Gregory L. Kelly, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This case is before the court on the defendants, Reliance Electric Company, and Dodge Manufacturing Company (collectively Company); United Steelworkers of America AFL–CIO & CLC (Union); and United Steelworkers of America AFL–CIO Local 1191 (Local), Motion to Dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The court has jurisdiction based on Section 1331 of Title 28 of the United States Code; the federal question is based on Section 185 of Title 29 of the United States Code.

### I.

The following is the procedural posture of the case. The case presently before the court is the residue of a dispute which consisted of two consolidated cases, *Wucsina et al. v. Reliance Electric Company et al.*, S 83–0112 and *Parks v. United Steelworkers of America*, S 83–0263. The plaintiffs moved for certification of a class action but, on September 29, 1986, the court denied that motion. 129 F.R.D. 164. In addition, the court denied the defendants' motions for summary judgment. The case proceeded to trial without a jury, which commenced on September 29, 1986. After the Order denying the certification of a class, the plaintiffs requested an opportunity to discuss the possibility of settlement; the court granted that request. No settlement was reached and the plaintiffs began presenting evidence on September 30, 1986. At the close of the plaintiffs' evidence the plaintiffs moved to dismiss the entire complaint in S 83–263 and moved to dismiss Count IV of the complaint in S 83–112.

The court granted those motions. Then the defendants each moved for dismissal under Rule 41(b) FRCP. The court ordered the parties to submit briefs by October 31, 1986. Those briefs were received and the case is ripe for decision.

The claims which remain include an allegation that the Union and Local breached their duty of fair representation during the resolution of grievance number 2039, and an allegation that the Company breached the collective bargaining agreement. Generally in cases which contain similar allegations the plaintiffs must show a breach of the Union's duty as a prerequisite to prevailing against the Company. Therefore, the court will consider the allegations against the Local and Union first.

### II.

Rule 41(b) of the Federal Rules of Civil Procedure states:

(b) **Involuntary Dismissal: Effect thereof.** For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

"In ruling on a Rule 41(b) motion, the court must take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive." *Sanders v. General Services Administration,* 707 F.2d 969, 971 (7th Cir.1983), *citing, Patterson v. General Motors Corp.,* 631 F.2d 476, 487 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981); *accord, Lee Tool & Mould, Ltd. v. Fort Wayne Pools, Inc.,* 791 F.2d 605, 610 n. 7 (7th Cir.1986). The following represents the court's findings of fact as provided for in Rule 52(a).

The remaining plaintiffs, Stephen W. Wucsina, Louis W. Parks, Mona Holdeman, Bruce Fisher, James L. Reed, and Robert Shaw, were production and maintenance employees at the Company's plant in Mishawaka, Indiana. In addition, they were members of the bargaining unit represented by the Local and the Union. The collective bargaining agreement (Agreement) which is pertinent to this case became effective November 2, 1981.

The Agreement included procedures which applied to all "alleged grievances". Those procedures consist of five steps. Step one is a discussion between the employee and his foreman which must take place within ten (10) working days of the time the employee is aware of an incident or complaint. If step one does not resolve the issue then within ten (10) working days the employee and the appropriate Grievance Committeeman shall take an appeal to the superintendent of the department, or if there is no department superintendent, to the Manager of Industrial Relations. If the issue is not resolved at step two, step three requires that within five (5) working days, an appeal shall be taken by the Grievance Committeeman to the Manager of Industrial Relations. In this case since there was no department superintendent step two and step three were combined. If the grievance is not resolved in step three it may be appealed to a representative of the International Union, then certified to the Company in writing and similarly a representative of the Company certifies back to the Union. Written notice of a step four appeal must be served on the Manager of Industrial Relations prior to the expiration of five (5) working days following the disposition of step three. Step four requires a meeting during which "either party may produce witnesses". If the grievance is not resolved at step four then it shall be decided by an arbitrator. Once the grievance reaches step four it is the sole responsibility of the Union representative. Further, it is a "consistent and long-standing policy of the International Union that the decision on whether or not grievances should be process to arbitration is the responsibility of the Servicing Staff Representative." In this case, Grievance 2039 was filed and proceeded from step one to step four. Grievance 2039 was resolved by the Union at step four and was not submitted to an arbitrator. Grievance 2039 reads in pertinent part as follows:

| Employee's Name ... Department | |
| --- | --- |
| All Affected | Laid Off |
| Employees | Employees |

We the Union Local 1191 are asking that all employee's receive severance allowance that are laid off. Since Dept and Divisions are moving out of the plant, we feel it is the Co. obligation to inform these people of their rights.

Settlement requested in Grievance Severance allowance for all employee's affected.

Article XV of the 1981 Agreement requires the payment of a severance allowance to employees whose employment is terminated directly or indirectly as a result of the permanent closing of a department, as follows:

Section 1—When, in the sole judgment of the Company, it decides to close permanently a plant or discontinue permanently a department of a plant or substantial portion thereof and terminate the employment of individuals, an employee whose employment is terminated either directly or indirectly as a result thereof because he was not entitled to other employment with the Company under the provisions of Article VIII, Section 6 of this Agreement and Section 2B below shall be entitled to a severance allowance

in accordance with and subject to the following provisions: ...

In addition Article XV provides:

Notwithstanding any other provisions of this Agreement an employee who would have otherwise been terminated in accordance with the applicable provisions of this Agreement and under the circumstances specified in Section 1 may, at such time, elected to be placed upon layoff status for thirty (30) days or to continue on layoff status for an additional thirty (30) days if he had already been on layoff status. At the end of such thirty (30) days period, he may elect to continue on layoff status or to be terminated and receive severance allowance if he is eligible to any such allowance under the provisions of this ARTICLE; provided, however, if he elects to continue on layoff status after the thirty (30) day period specified above, and is unable to secure employment with the Company within an additional sixty (60) day period, at the conclusion of such additional sixty (60) day period he may elect to be terminated and receive severance allowance if he is eligible for such allowance.

The plaintiffs contend that the facts pertinent to this case begin in 1977. The plaintiffs contend that they were laid off as a direct or indirect result of the Company closing various parts of the plant since 1977. Further they contend that the Union failed to fairly represent the laid off members of the bargaining unit because the Union was allegedly hostile to the second shift. Finally they contend that they were eligible for severance due to the layoffs and subsequent closing of portions of the plant.

In 1977 the warehouse was closed; none of the plaintiffs were terminated or laid off due to the closing of the warehouse. The next alleged closing or permanent discontinuance occurred when in 1979 some machines called "Multimatics" were moved out. None of the plaintiffs were terminated or laid off as a result of the move of the Multimatics. The Company apparently moved out unspecified portions of the "Gear Plant" in 1979. Nevertheless, all employees laid off at that time were recalled. There were no closings or permanent discontinuances in 1980. Although some of the named plaintiffs were laid off in 1980, they were recalled no later than February 1981.

In "late 1981" the Company decided to eliminate the second shift in the Foundry. There is no evidence that such an elimination was a closing or permanent discontinuance as defined by the Agreement. The record demonstrates that that decision was made due to lack of work as a result of economic conditions. Named plaintiff, Mona Holdeman, was laid off in November 1981, but she was not working the second shift in the Foundry. Further, the record is void of any evidence that she was "bumped"[1] to layoff by an employee who had been working in a portion of the plant that was closed or permanently discontinued.

The next plaintiff laid off was Robert Shaw. He was laid off on January 18, 1982; his last job was working in trucking. However, he was on sick leave from December 1981 to his release date January 18, 1982. There is no evidence in this record that proves that Mr. Shaw was bumped to layoff by an employee who worked in any portion of the plant that was closed or permanently discontinued.

Two plaintiffs, Louis Parks and James Reed, were laid off in late January 1982. Both of these employees worked in the Foundry. They believe that they were laid off as a result of the elimination of the second shift. Mr. Parks also felt that his layoff was indirectly caused by elimination of jobs in the speed reducer area. Nevertheless, There is no evidence which proves

---

1. The term bumped refers to Article VIII Section 6B of the Agreement. Briefly bumping occurs when an employee whose job is eliminated displaces a less senior employee. In some cases one bump may set off a chain of bumps through several employees until the least senior employee has no one to bump and is laid off. Bumping may also occur when a more senior employee returns to the work force from a leave of absence. The term is also used when an employee successfully bids to an open job.

that Mr. Parks or Mr. Reed were laid off as a result of any closing or permanent discontinuance.

Plaintiff Mark Wucsina was laid off February 28, 1982; he worked in the Foundry's third shift. He believes that he was bumped to layoff by another Foundry worker. However, the record is void of evidence which proves that Mr. Wucsina was laid off directly or indirectly as a result of a closing or permanent discontinuance.

Finally, Bruce Fisher was bumped to layoff on May 2, 1982. Although Mr. Fisher had less seniority than other employees who had been laid off earlier, he enjoyed "superseniority" because he was a Grievance Committeeman. Mr. Fisher admitted that although he was working in the machine shop when he was bumped, that the elimination of the second shift in the Foundry caused his layoff. There is no evidence in the record which proves that Mr. Fisher was laid off directly or indirectly as a result of a closing or permanent discontinuance.

The plaintiffs argue that their layoffs were directly or indirectly caused by the Company's decision to close either the gear plant or the bearings couplings and drive (BCD) plant. To support this argument the plaintiffs rely on the cumulative closings since 1977 and a domino theory of bumping. The plaintiffs have not provided evidence which supports even an inference that the distinct closings since 1977 were related in any way to the announced closing of the gear or BCD plants in 1982. Briefly the domino theory is that an employee working in either the gear or BCD plant and who had some seniority has his job eliminated, then he bumps an employee, who bumps another employee, who bumps another employee and so on until the bumping gets to the employee who does not have sufficient seniority to bump another employee. The domino theory would be of value if the resulting layoffs were in some way related to a decision by the Company to close or permanently discontinue a plant or substantial portion thereof. The Company did not decide to close the gear plant

until after June 20, 1982, and the decision to close the BCD plant was subsequent to that. It is clear that the decisions to close the gear and BCD plants came after the plaintiffs were laid off. There is no evidence which refutes that the pertinent decisions were made after June 20, 1982. Further, there was unrefuted evidence which indicated that the plaintiffs' layoffs were caused by a lack of work due to poor economic conditions.

The Local and Union were shocked when on July 6, 1982 the Company announced that it would be closing the gear plant. The Local filed a grievance demanding severance pay for all laid off employees. The Company's position was that all layoffs prior to July 6, 1982 were caused by lack of work and poor economic conditions not the decision to close the gear plant. Further the Company's interpretation of Article XV of the Agreement required payment of severance pay only to employees who were laid off after the July 6, 1982 announced closing and were laid off directly from a closed or substantially discontinued portion of the plant or were directly bumped to layoff by an employee from a closed or substantially discontinued portion of the plant. Consequently, the Company denied Grievance 2039 at steps one through three.

The Union's Staff Representative, Gene Chlebowski appealed Grievance 2039 to step four by a letter dated September 9, 1982. At that point in the grievance procedure the Local is merely an advisor; the Union has sole responsibility for resolution of a grievance.

The dispute became more complex when the Company announced, on November 3, 1982, that portions of the BCD plant would be closed permanently. Subsequently the Union and the Company began negotiating over the effects of the announced closing on the members of the bargaining unit. Mr. Chlebowski led the Union's negotiating team and Mr. Marty Young, the Company's head of Corporate Labor Relations led the Company's team. Shortly after the negotiations began, on November 17, 1982, the Company demanded that Grievance 2039 be withdrawn. In return, the Company of-

fered a Special Early Retirement Program (SERP) which included:

1. Window period in effect until December 31, 1982.

2. Employee must be at least 57 with ten years of service.

3. Actuarial reduction of 3% per year for each year prior to age 62.

4. Pension multiplier of $14.50 per year of service.

5. $75.00 monthly supplement between ages of 57 and 62.

The Union's initial proposal included demands that the Company pay severance benefits to all bargaining unit employees laid off on or after January 1, 1982; that the SERP be modified to equal the SERP given to management with $14.50 per year until the employee becomes eligible for social security; that the SERP window be extended to three months; and that insurance benefits for all bargaining unit employees on layoff be extended six months. On November 18, 1982, the Union and Company continued the negotiations. The discussion of the severance pay was vigorous, but the Company steadfastly held to their interpretation of Article XV of the Agreement. The lack of flexibility in the negotiations led Mr. Chlebowski to accuse the Company of "playing games" and he walked out of the negotiations. On Friday, November 19, 1982 the negotiations resumed but Mr. Chlebowski was not present. Following a protracted discussion about Grievance 2039 the Company agreed to expand the payment of severance pay to any employee laid off after July 6, 1982 regardless of where they had worked or who had bumped them to layoff. In addition, the Company agreed to extend insurance coverage for laid off employees to five months and offered an SERP which included:

1. Window period through December 31, 1982.

2. Employee must be 55 with ten years of service.

3. No actuarial reduction.

4. Pension multiplier of $14.50, $15.00 in 1983.

Following this change in the Company's position the Union's team went to the Local's union hall. A frank and open exchange of views occurred during which the following factors were discussed:

1. The severance pay grievance could be lost.

2. There were adverse arbitration awards denying severance pay to laid off employees.

3. It would be very difficult to disprove that layoffs commencing prior to July 6, 1982 were for economic reasons.

4. SERP should result in a large number of retirements, hopefully making room for the recall of laid off employees.

5. SERP was a benefit not required by contract.

In addition the Union's team was aware that in cases involving similar severance pay clauses an arbitrator's interpretation of the severance pay clause supported the Company's original position. The members of the Union's team decided that the proposed resolution of Grievance 2039 and the proposed supplemental benefits were the best resolution possible. The Union's team then contacted Mr. Chlebowski and explained the entire proposal; Mr. Chlebowski agreed that the proposal was a good resolution. An oral agreement was reached with the Company which was reduced to writing and signed on December 15, 1982.

During the interim between the oral agreement and signing the written agreement, the Local called a meeting to explain the agreement reached. That meeting was held at Marion High School on November 26, 1982. At that meeting, the members of Local 1191 were told that Grievance 2039 was settled, and the basis of that settlement. In addition, the supplement benefits which had been negotiated were explained.

The plaintiffs allege that the resolution of Grievance 2039 is another example of the hostility which the plaintiffs believe the Union had for second shift or less senior members of the bargaining unit. The evidence of conduct of the Local union leadership prior to April 1982 is irrelevant because the leadership changed in April fol-

lowing an election. However, during the Marion High School meeting and several discussions which occurred subsequent to that meeting the plaintiffs allege that the Union and Local treated them unfairly. Although the atmosphere of the Marion High School meeting was loud the record is void of any facts which demonstrate intentional or willful conduct directed at depriving the plaintiffs of fair representation. Further, the plaintiffs admitted that they were unaware of any facts which would demonstrate that the Union representative, who had sole responsibility for Grievance 2039 in step four, bore them any ill will or had a grudge against them.

### III.

■ The burden of proof in an unfair representation case is heavy. The United States Court of Appeals for the Seventh Circuit has held that the plaintiffs must "[present] 'substantial evidence of fraud, deceitful action or dishonest conduct', on the part of the [union] leadership." *United Independent Flight Officers v. United Air Lines*, 756 F.2d 1274, 1283 (7th Cir.1985) (quoting, *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir.1981)); *see also, Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242 (7th Cir.1986). Further, the plaintiffs must prove that the union "committed intentional misconduct which under *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 522 (7th Cir. 1981), is an essential component of any suit attacking the adequacy of a union's representation." *Camacho*, 786 F.2d at 243–244. In *Dober v. Roadway Express, Inc.*, 707 F.2d 292 (7th Cir.1983), the court held that "intentional misconduct" is when the facts demonstrate "that the union acted in bad faith in prosecuting his grievance; where the union knowing that the worker has a possibly meritorious grievance [was] unwilling to prosecute it ..." *Id.* The facts of this case demonstrate that the Union did prosecute Grievance 2039. The Union, armed with the knowledge that in similar arbitration decisions the Company's original position had been supported, decided that the rational choice was to accept the grievance settlement and the supplemental benefits. The Union believed that

choice was best for the entire local 1191 membership since the SERP would help open jobs to which laid off employees would be recalled. The record demonstrates that many employees have been recalled including some who had less seniority than the plaintiffs. The evidence in this record does not demonstrate intentional misconduct or gross negligence. Therefore, judgment in favor of the Local and Union is proper.

■ "To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union ... The grievance processes cannot be expected to be error-free." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–571, 96 S.Ct. 1048, 1059–1060, 47 L.Ed.2d 231 (1976); *accord, United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 61–62, 101 S.Ct. 1559, 1563–1564, 67 L.Ed.2d 732 (1981); *see also, Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The plaintiffs have failed to carry their burden to demonstrate a breach of the Union's duty of fair representation. Consequently, the claims against the Company cannot be maintained. *Accord, Superczynski v. P.T.O. Services, Inc.*, 706 F.2d 200 (7th Cir.1983).

Although the plaintiffs may disagree with the resolution of Grievance 2039, the record before the court does not support their claims. There is no evidence that the Union or Local acted in bad faith or with intentional misconduct toward the plaintiffs. Therefore, the defendants' motions for involuntary dismissal pursuant to Rule 41(b) is granted.

Accordingly, and for all the above reasons, it is the ORDER of the court that the defendants, Reliance Electric Company; Dodge Manufacturing Company; United Steelworkers of America AFL–CIO & CLC; and United Steelworkers of America AFL–CIO & CLC Local 1191, Motions to Dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure be, and are hereby, GRANTED. It is FURTHER ORDERED

that judgment be entered in favor of the defendants and against the plaintiffs. Costs to be assessed against the plaintiffs. SO ORDERED.