832 F.2d 76
 126 L.R.R.M. (BNA) 2486, 107 Lab.Cas. P 10,213
 Robert GRANT, Plaintiff-Appellant,
v.
BURLINGTON INDUSTRIES; Employer's Resources, Inc.; Local
710, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Defendants-Appellees.
 No. 86-2237.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 16, 1987.
Decided Sept. 24, 1987.
 
 Mark S. Stein, Cornfield & Feldman, Chicago, Ill., for plaintiff-appellant.
 Michael R. Flaherty, Keck Mahin & Cate, Barry M. Bennett, Asher Pavalon Gittler & Greenfield, Barbara Lazar, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, CUDAHY and EASTERBROOK, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 The plaintiff, Robert Grant, brought this action against his former employers, Burlington Industries ("Burlington") and Employer's Resources, Inc. ("ERI"), alleging that they discharged him in violation of his rights under a collective bargaining agreement. Grant also sued his collective bargaining agent, Local 710 of the International Brotherhood of Teamsters ("Local 710"), charging that Local 710 breached its duty to fairly represent him in processing his grievance protesting his discharge. The district court awarded summary judgment in favor of Local 710 and also entered judgment in favor of the employer defendants. Grant brought this appeal. We affirm.
 
 I.
 
 2
 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the facts, we must resolve any doubt as to the existence of a genuine issue for trial against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970).
 
 
 3
 Grant worked as a truck driver for Burlington beginning in 1973. The truck drivers at Burlington were initially represented by the Chicago Independent Truck Drivers Union. Thereafter, ERI formally employed the truck drivers at Burlington. Beginning in July, 1984, the truck drivers, including Grant, were represented by Local 710. Grant has long been an openly active leader of Teamsters for a Democratic Union, an organization of union dissidents. He publicly opposed Local 710's replacement of the Chicago Independent Truck Drivers Union as the representative of the Burlington truck drivers.
 
 
 4
 On January 9, 1985, Grant was discharged by ERI allegedly for failing to undertake a trip as dispatched the previous day. Grant contends that he refused to make the trip because when asked to do so he had already completed his work day, and because the dispatcher should have first asked one of the two other drivers with less seniority than he who were present. Grant also claims that the dispatcher only requested that he make the overtime trip and accepted Grant's refusal.
 
 
 5
 Article 4 of the collective bargaining agreement between Local 710 and ERI requires ERI to give an employee a written warning notice (with a copy of the notice to Local 710) prior to discharging him or her:
 
 
 6
 The Employer shall not discharge nor suspend any employee without just cause. With respect to discharge or suspension, which includes repeated tardiness or absence from duty, the Employer shall give at least one warning notice of the complaint against such employee to the employee in writing and a copy of same to the Local Union ... except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty or drunkenness, when such charges are proven.... Discharge without warning if the employee is under the influence of any drug which use of is prohibited by state or federal law.... Failure of the employer to comply with the requirement of a warning letter prior to discharge or suspension for any offense other than dishonesty or drunkenness when such charges are proven will automatically waive the Employer's rights under Article 6 of this Agreement and the Union will be permitted to take any economic action it deems necessary to enforce full compliance....
 
 
 7
 Grant's Complaint, Exhibit A (emphasis added). Grant was not given a warning notice of the complaint against him prior to his discharge.
 
 
 8
 Grant filed a grievance against ERI and discussed his grievance with Local 710 business agent Alex Kern. At that time, Grant told Kern everything he then wanted to say concerning his grievance. He asked Kern to obtain certain documents for him from ERI, including the January 8, 1985 manifests (delivery instructions and receipts) and timecards of himself and two other drivers. Grant told Kern that these documents would prove that he was discharged without cause. Grant spoke with Kern a second time to inform Kern that he had received ERI's formal discharge letter.
 
 
 9
 Grant was then notified by Local 710 that a hearing on his grievance would be held on January 30, 1985, before a joint union-employer grievance committee known as the Joint State Committee (the "JSC"). The JSC consists of an equal number of union and employer representatives. Article 6 of the collective bargaining agreement provides in part:
 
 
 10
 The Operators and Union shall together create a permanent Committee. The Joint Committee shall consist of an equal number representing Employers and Union but no less than three from each group....
 
 
 11
 It shall be the function of the Committee above referred to, to settle disputes which cannot be settled between Employer and the Local Union....
 
 
 12
 ....
 
 
 13
 A. Where a Joint Committee by a majority vote settles a dispute no appeal may be taken. Such a decision will be final and binding on both parties.
 
 
 14
 ....
 
 
 15
 D. Failing to arrive at a settlement by this procedure same shall be submitted within thirty days to an arbitrator.... The decision of the arbitrator shall be final and binding upon the parties.
 
 
 16
 Grant's Complaint, Exhibit A.
 
 
 17
 Grant claims that prior to the January 30 hearing, he called Kern six or seven times at the Local 710 offices and was told each time that Kern was not in. He further claims that on January 24, he went to the union offices in person to see Kern, but was told that he was unavailable. Kern contends that he tried to return Grant's calls, but no one answered the phone. According to Grant, someone would have been at his house to receive Kern's phone calls.
 
 
 18
 Kern and ERI President Samuel Solomon testified at deposition that Kern asked Solomon to reinstate Grant. Kern further claims that he obtained the documents from Solomon that Grant requested and that those documents were presented to the JSC. Grant disputes this; Grant contends that he himself had to obtain the documents because Kern failed to do so. Grant also claims that Kern did not investigate his grievance or question any witnesses.
 
 
 19
 At the January 30 hearing, Grant explained his grievance to the JSC. He pointed out that under the collective bargaining agreement he had the right to receive a warning letter prior to termination and that he did not receive such a warning. Kern told the committee that Local 710 agreed with Grant's interpretation of the collective bargaining agreement and that Grant was correct in stating that he should have received a warning letter. Kern said nothing else at the hearing in Grant's defense. Grant also attempted to present at the JSC hearing the January 8 manifests and timecards, but the chairman of the JSC, an employer representative on the committee, ruled that these documents were irrelevant and would not permit them to be presented.
 
 
 20
 The JSC upheld Grant's discharge. At some point during or after the hearing, Grant signed the following form statement:
 
 
 21
 I acknowledge that I have had the opportunity to speak during these proceedings on behalf of my grievance and I further acknowledge that all the evidence that I care to present in support of my grievance has been presented and I am satisfied with the representation I have received from the Union.
 
 
 22
 Grant claims that he signed the statement without reading it and on Kern's representation that it was a document stating that he had had a hearing.
 
 II.
 
 23
 The well-established standard in this circuit for determining whether a union has breached its duty of fair representation was initially expressed in Hoffman v. Lonza, Inc., 658 F.2d 519 (7th Cir.1981). There, this court held that a plaintiff in such a case must show that a union was guilty of "intentional misconduct." Id. at 522. We further held that "[m]ere negligence" on the part of a union is not sufficient misconduct to support an action for a breach of a union's duty of fair representation. Id. at 523.
 
 
 24
 At the time Hoffman was decided, this court appeared to be split as to the appropriate standard for evaluating a duty of fair representation claim. Compare Hoffman, 658 F.2d at 521 (citing Dwyer v. Climatrol Indus., Inc., 544 F.2d 307 (7th Cir.1976), cert. denied, 430 U.S. 932, 97 S.Ct. 1553, 51 L.Ed.2d 776 (1977) and Cannon v. Consolidated Freightways Corp., 524 F.2d 290 (7th Cir.1975)) with Hoffman, 658 F.2d at 523-24 (Cudahy, J., concurring) (citing Miller v. Gateway Transp. Co., 616 F.2d 272 (7th Cir.1980) and Baldini v. Local Union No. 1095, UAW, 581 F.2d 145 (7th Cir.1978)).[1] The circuits continue to be split on this question. In fact, every other circuit that has addressed the issue has declined to require, as this court did in Hoffman, a showing of hostile motivation by the union; rather, the other circuits have held that "arbitrary" or "perfunctory" conduct by a union constitutes a breach of its duty of fair representation.[2] The disagreement among the circuits largely centers on differing interpretations of three Supreme Court decisions, Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); and Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 25
 Nonetheless, this court has repeatedly reaffirmed its commitment to the Hoffman "intentional misconduct" standard; we therefore decline Grant's suggestion to overrule that standard, just as all previous invitations have been declined. See Camacho v. Ritz-Carlton Water Tower, 786 F.2d 242 (7th Cir.1986); Dober v. Roadway Express, Inc., 707 F.2d 292 (7th Cir.1983); Superczynski v. P.T.O. Servs., Inc., 706 F.2d 200 (7th Cir.1983); Graf v. Elgin, Joliet & Eastern Ry., 697 F.2d 771 (7th Cir.1983).[3]
 
 
 26
 Grant clearly has not met the requirements of the Hoffman standard of intentional misconduct. Grant claims that he was given poor representation by the union because he was a vocal critic of the union.[4] Our recent opinion in Camacho stated that "[a] union may be liable if it discriminates against employees for forbidden reasons (such as race or politics, including the employee's position on the union and its leaders)." 786 F.2d at 244. Yet this court also stated in Camacho that perfunctory or grossly negligent conduct does not reach the level of the required intentional misconduct. Id.
 
 
 27
 Grant has demonstrated at best only that the representation he received from Local 710 was perfunctory. Grant has presented no evidence that his representation by Local 710 was inferior to that provided any other union member. Nor has he presented any evidence that if there was any difference, it was motivated by impermissible reasons, such as his status as a union dissident. In fact, Grant admitted during his deposition that he had no evidence that the manner in which Local 710 handled his grievance was related to his dissident union activities.[5] As the district court stated, "Grant does not even present any evidence from which an inference of intent to discriminate can be inferred, such as the hiring of a nondissident worker to replace Grant after he was discharged." No. 85-C-6391 at 6 (N.D.Ill. June 9, 1986) (order granting summary judgment).
 
 
 28
 Grant further contends that the union representatives on the joint grievance committee owed him a duty of fair representation, just as Kern did, and that they breached this duty by refusing to submit his grievance to arbitration. The First Circuit has rejected a similar claim and has held that:
 
 
 29
 Without any indication from either the Supreme Court or the collective bargaining agreement that a joint committee is to be perceived differently from an arbitrator, we cannot impose a duty of partiality on the members of such an adjudicatory body. Members of a joint committee, like arbitrators, must decide each case honestly and conscientiously on its merits.
 
 
 30
 Early v. Eastern Transfer, 699 F.2d 552, 560 (1st Cir.), cert. denied, 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983). Although we find the First Circuit's reasoning persuasive, we need not resolve here the question what duty, if any, a union member of a joint committee owes to a grievant before the committee. Grant has presented absolutely no evidence that the union members of the JSC in upholding Grant's discharge were acting on improper motives, such as retaliation against Grant for his activities as a union dissident.
 
 
 31
 Finally, Grant argues that even if we uphold the district court's grant of summary judgment for Local 710, we should nevertheless reverse as to Burlington and ERI. Grant acknowledges that a plaintiff must normally prove that a union has breached its duty of fair representation in order to prevail in a section 301 action against his or her employer. Grant argues, however, that the grievance procedure was not exclusive under the facts of this case and that where a grievance procedure is nonexclusive, a plaintiff's duty of fair representation claim need not be successful to prevail on the section 301 claim.
 
 
 32
 Grant "admits that he did not raise this precise argument before the District Court...." Grant's Reply Brief at 14. It is a "long-held and well-founded rule" that "an issue not raised in the district court is waived on appeal." Evans v. Fluor Distrib. Cos., 799 F.2d 364, 366 (7th Cir.1986). Grant argues that it nevertheless would be "manifestly unjust" for us to refuse to consider this issue. We disagree. In the district court's order of June 9, 1986, granting summary judgment for Local 710, the court stated that it would hold a "status hearing on June 24, 1986 at 9:30 a.m., at which time the question of whether the claim of plaintiff against ERI should be dismissed." Order at 9-10. Grant thus had notice of the content of the hearing to enable him to prepare his arguments, as well as an opportunity to present his position to the district court. Because Grant did not raise his "nonexclusive remedy" argument before the district court, we conclude that he waived that argument and decline to consider it.
 
 III.
 
 33
 For the reasons stated above, we affirm the judgment of the district court.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Judge Cudahy's concurrence in Hoffman advocated a standard set out by this court in Baldini, 581 F.2d 145. 658 F.2d at 524. The standard in Baldini would examine "whether the union has ... 'been guilty of malfeasance and [whether] its conduct was within the range of acceptable performance by a collective-bargaining agent.' " 581 F.2d at 151 (quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 568, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976))
 
 
 [2]
 See De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970); Griffin v. United Auto Workers, 469 F.2d 181 (4th Cir.1972); Ruzicka v. General Motors Corp., 523 F.2d 306 (6th Cir.1975) (Ruzicka I ); Ruzicka v. General Motors Corp., 649 F.2d 1207 (6th Cir.1981) (Ruzicka II ); Curtis v. United Transp. Union, 700 F.2d 457 (8th Cir.1983); Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270 (9th Cir.1983). See generally Turner, Intentional Misconduct and the Union's Duty of Fair Representation: the Seventh Circuit's Hoffman Standard, 63 Chi.-Kent L.Rev. 43, 50-53 (1987). For a discussion of the Hoffman approach, see Turner, supra, at 53-63, and Holzhauer, The Contractual Duty of Competent Representation, 63 Chi.-Kent L.Rev. 255, 260-62, 264-74 (1987)
 
 
 [3]
 In this court's recent opinion in Camacho, the court discussed extensively its reasons for adhering to the Hoffman standard. Rather than repeat that discussion here, we refer interested readers to Camacho, 786 F.2d 242, and for a contrary point of view to Camacho, 786 F.2d at 246 (Cudahy, J., concurring in the result)
 
 
 [4]
 Grant argues that an inference of animus on the part of the union should be inferred simply from the existence of "a meritorious grievance and membership in a class toward which the union is likely to be hostile." Grant's Brief at 23. We find that this is an insufficient showing of intentional misconduct to satisfy Hoffman and our later opinions applying Hoffman
 
 
 [5]
 Grant responded to questioning at his deposition as follows:
 Q. What, in your mind, speaking of facts,--
 A. Okay.
 Q. --shows that the handling of your grievance concerning your discharge by Mr. Kern was somehow linked to your activities in [Teamsters for a Democratic Union]?
 A. I'm not able to do that.
 Q. Similarly, can you point to anything that shows that Local 710 was somehow dishonest with you or fraudulent with you in the manner in which they processed your grievance aside from what you told us today?
 A. Other than a total lack of communication between myself and Mr. Alex Kern.
 ....
 Q. Do you have anything, facts, again, that you can tell us that shows that aside from what you have mentioned today that Local 710 retaliated against you because of your activities in TDU?
 A. Not to my knowledge.
 Local 710's Reply Memorandum in Support of Motion for Summary Judgment, Exhibit (Sept. 10, 1985 deposition of Grant at 52-53).