Lester D. ANTRIM, et al., Plaintiffs–Appellants,

v.

BURLINGTON NORTHERN, INC., and United Transportation Union, Defendants–Appellees.

No. 87–2546.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1988.

Decided May 17, 1988.

---

Homer J. Tice, Knuppel, Grosboll, Becker & Tice, Petersburg, Ill., John L. Davidson, Jr., Greenfield, Davidson & Ward, St. Louis, Mo., for plaintiffs-appellants.

Thomas J. Knapp, Burlington Northern R.R. Co., Ft. Worth, Tex., Pamela D. Walker, Pamela D. Walker, P.A., Little Rock, Ark., for defendants-appellees.

Before CUMMINGS, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

When the Burlington Northern Railroad acquired the St. Louis–San Francisco Railway in 1980, it had to provide for the protection of employees affected by the transaction. 49 U.S.C. § 11347. It negotiated with several unions, including the United Transportation Union (the Union), an agreement incorporating the *New York Dock* conditions, named after *New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). The *New York Dock* conditions require the railroad to compensate its employees in the event the merger causes a harmful diminution or diversion of traffic. The union or employee must demonstrate (1) diversion or diminution, (2) effect on the employee in question, and (3) detriment, which generally means wages lower than the employee earned in a prior period. If the railroad rejects a request for compensation, the union may take the claim to arbitration under the Railway Labor Act, 45 U.S.C. § 153 First (i), and if still dissatisfied may ask the Interstate Commerce Commission for review. *Chicago & North Western Transportation Co.—Abandonment—Near Dubuque and Oelwein, Ia.,* — I.C.C.2d — (Apr. 17, 1987); *Atlantic Richfield Co. and Anaconda Co.—Control—Butte, Anaconda & Pacific R.R. and Tooele Valley R.R.,* — I.C.C.2d — (Feb. 17, 1988). Judicial review is forbidden by 45 U.S.C. § 153 First (q) unless the arbitrators failed to comply with the Railway Labor Act, exceeded their jurisdiction, or perpetrated "fraud or corruption". *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). (The extent to which the ICC may (or must) review decisions in cases arising out of labor-protection conditions is the subject of pending petitions for judicial review, and we express no opinion on it.)

Some of the Union's members in central Illinois noticed that fewer and shorter trains were passing through their territory

after the merger, and they sought compensation. The Railroad replied that a downturn in business had caused the shortfall, and that the merger was not responsible. The Union disagreed. In April 1982 the Union and the Railroad submitted some claims to a panel under the Railway Labor Act, in the expectation that the decision would set the pattern for similar claims. The majority of Public Law Board No. 3160 concluded that the merger led to the rerouting of a single daily train away from the territory in question and invited the parties to settle their dispute on that basis. In January 1983 they did so, signing an agreement designating ten employees as "affected" by the displacement of traffic, and eight of these ten as injured during the months covered by the award. Since the settlement, the eight have been receiving monthly benefits; some other employees also receive benefits under labor-protection agreements predating the 1980 merger. (These older agreements do not require proof that the lost work was attributable to the merger, but they apply only to employees working when the earlier mergers occurred.) No other employees have received payments on account of the 1980 merger or any reduction or displacement of traffic it may have caused.

Many members of the local union were dissatisfied and continued to submit claims for compensation. These fall into three groups. (1) The two employees deemed "affected" by the rerouted train but not "displaced" during the months covered by the award sought compensation for other months when, they said, they had lost wages. (2) Employees not among the ten deemed "affected" by the rerouting contended that they, too, had lost work as a result of the shift. (3) Still other employees continued to insist that the merger had rerouted more than one train out of their territory, and they wanted compensation for the loss they perceived. The record is unclear about which of these persons protested, when, and to whom; we need not resolve any disputes of this character. The Union asked the Railroad to recognize the validity of the claims; the Railroad re-

fused, contending that the whole subject was closed by the January 1983 settlement.

In early 1984 the Union took a second group of cases to arbitration. It pressed claims in the first two categories, apparently abandoning hope of persuading a panel that more than one train had been diverted. Special Board of Adjustment No. 918 held in August 1984 that the earlier award, plus the settlement, disposed of all possible claims in the first two groups. Asked to set aside both the earlier decision and the settlement on a number of grounds, Board No. 918 refused. No one asked the ICC to review this decision, and none of the three grounds of judicial review is present.

The employees in central Illinois instead filed this class action in late 1984 against both the Union and the Railroad, contending that the Railroad violated the agreement of 1980, and the Union violated its duty of fair representation. This "hybrid" contract-duty of fair representation suit is governed by a six-month statute of limitations, and it is unlikely that the suit is timely, since as Board No. 918 held everything of substance was over and done with in January 1983. See *Bonds v. Coca–Cola Co.*, 806 F.2d 1324 (7th Cir.1986). The district court nonetheless rejected the plaintiffs' claim on the merits, and as a defense based on the statute of limitations is not jurisdictional we need not reach the question, for we agree with the grounds on which the district court resolved the case.

■ This court has no power to review the merits of decisions of arbitral panels under the Railway Labor Act. See *Sheehan* and, e.g., *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). A contention that the union violated its duty of fair representation questions the inputs into the arbitral process rather than the panels' decisions, however, and may be maintained under the jurisdiction granted by § 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185. *Czosek v. O'Mara*, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); *Graf v. Elgin, Joliet & Eastern Ry.*, 697 F.2d 771 (7th Cir.1983)—at least to the extent it

seeks relief against the Union, an important qualification to which we return.

■ As a suit against the Union, however, this case is doomed by *Graf* and the many other decisions of this court holding that only discrimination or other intentional misconduct violates the duty of fair representation. E.g., *Grant v. Burlington Industries*, 832 F.2d 76 (7th Cir.1987); *Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242 (7th Cir.1986), both collecting still more cases. The district court properly granted summary judgment to the Union, because there is no dispute about any *material* fact. Representation is "fair" even if ineffectual; the union may choose to devote resources to projects other than processing grievances, with the consequent diminution in the quality of contract administration. Negligence, even gross negligence, is not "unfair" representation. Unless the union's hierarchy is out to get the complaining members—perhaps on prohibited grounds such as race, perhaps because of political squabbles within the union—a failure to handle a claim skilfully or successfully is not a source of legal liability.

The plaintiffs do not claim that the Union took their race, politics, or other prohibited criteria into account. It seems unlikely that internecine disputes account for the outcome; among the losers was the president of the local union, whose claims have been rejected consistently. The Union has gone to arbitration twice, the second time in an effort to extend the extent to which it had prevailed before the first panel. There is a genuine dispute about the cause of the diminished work in central Illinois; the first panel agreed with the Union in part and with the Railroad in part. The Union has not had the success for which its adherents hoped, but this is hardly a ground of liability. A union also might be liable to its members for dishonoring a more specific contractual promise, see James D. Holzhauer, *The Contractual Duty of Competent Representation*, 63 Chi.–Kent L.Rev. 255 (1987), but none has been urged in this case.

Perhaps the Union erred by basing the settlement of January 1983 on only two months' work, which forever denied benefits to two workers deemed "affected" but not "displaced" in those months and to any workers who were not "affected" in those months but could be in the future. But any settlement is a compromise in which each side gets less than its maximum objective. The record contains nary a clue that this settlement was drafted as it was in order to disadvantage unpopular members of the union, or otherwise depended on forbidden grounds of action.

Plaintiffs' evidence of intentional misconduct (taken in the light most favorable to them) is principally a string of unfulfilled promises by the president of the local and the representative of the international, who kept urging the members to submit claims for benefits and implied they would get results. Exaggerated promises—perhaps in an effort avoid unrest that might be reflected at the ballot box in union elections—are not the sort of "intentional" wrongdoing with which *Graf, Camacho,* and similar cases are concerned. Lying to the members (if that is what happened) is far removed from invidious discrimination among them. It is the use of forbidden grounds of decision that creates a legitimate claim of "unfair" representation. The other bits of evidence do not carry the day. The plaintiffs complain, for example, that the president of the local did not post the January 1983 settlement agreement but instead discussed it at a meeting. Edgar Allen Poe made a nice tale out of the stratagem of hiding something by putting it just where people would look first, and perhaps the president of the local had this in mind. Apparently the last place where the members of this local expect to receive important information is at a meeting—which may be why, the record discloses, the local's meetings are sparsely attended. Still, it is hardly a breach of the duty of fair representation to suppose that information of general interest to the members might be revealed at their meeting. The plaintiffs also insist that the Union's bad faith appears in the fact that the settlement agreement did not dole out benefits in seniority order. Doubtless many benefits go by seniority; the *New York Dock* condi-

tions, however, direct benefits to those actually injured by rerouted or reduced traffic. The settlement agreement was an effort (whether successful is not our province to say) to implement an arbitral award applying *New York Dock*. That it did not implement some competing vision of how benefits ought to be awarded is irrelevant.

So the claim against the Union fails. We held in *Graf*, 697 F.2d at 781, and *Frandsen v. Brotherhood of Railway Clerks*, 782 F.2d 674, 684 (7th Cir.1986), that when this happens, the claim against a railroad employer must be dismissed for want of jurisdiction. The district court followed that path. This means we can avoid a host of jurisdictional problems unique to hybrid contract-duty of fair representation litigation under the Railway Labor Act. A railroad is not an "employer" for purposes of § 301, see 29 U.S.C. § 152(2) and (3), so jurisdiction must come from elsewhere. In hybrid cases under § 301, employers may be called on to pay the portion of the loss caused by their breach of contract, see *Bowen v. Postal Service*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), yet under 45 U.S.C. § 153 First (q) a court may not declare that the railroad *has* broken its contract unless one of the three conditions is satisfied, even if it otherwise has jurisdiction. *Czosek*, 397 U.S. at 29–30, 90 S.Ct. at 773–74, therefore reserved the question whether a railroad employer may be held liable. The situation gets even knottier when primary jurisdiction to review any disputes about the railroad's obligations lies in the ICC, see *United Transportation Union v. Norfolk & Western Ry.*, 822 F.2d 1114 (D.C.Cir.1987); *Bautista v. Pan American World Airlines*, 828 F.2d 546, 549, 551–52 (9th Cir.1987); *Zapp v. United Transportation Union*, 727 F.2d 617, 627 n. 16 (7th Cir.1984); *Augspurger v. Brotherhood of Locomotive Engineers*, 510 F.2d 853 (8th Cir.1975). There may be federal-question jurisdiction, based on federal common law (see *Graf*, 697 F.2d at 776–77), when the union and railroad are in cahoots, see *Glover v. St. Louis–San Francisco R.R.*, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), but the extent of this jurisdiction is unclear at best—as is the question whether bare "jurisdiction" permits a remedy given § 153 First (q)—and the proper rule when the ICC has primary jurisdiction is even murkier. The Railroad has presented these thorny questions for decision. Since the claim against the Union must be dismissed, any basis of jurisdiction over the Railroad dissolves, and we need not address other potential jurisdictional flaws.

AFFIRMED.